**ENGLISH FEEDLOT, INC., Plaintiff,**

v.

**NORDEN LABORATORIES, INC., and its successor in interest, SmithKline Beecham Animal Health, Inc., a Nebraska corporation, SmithKline Beecham Clinical Laboratories, Inc., a South Dakota corporation, and SmithKline Beecham Corporation, a Pennsylvania corporation, Defendants.**

Civ. A. No. 92–B–2076.

United States District Court, D. Colorado.

Oct. 7, 1993.

1500

Daniel W. Patterson and Ian S. Karpel, Holland & Hart, Denver, CO, for plaintiff.

George B. Curtis, Gibson, Dunn & Crutcher, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants SmithKline Beecham Animal Health, Inc., SmithKline Beecham Clinical Laboratories, Inc., and SmithKline Beecham Corporation (in its own corporate capacity and as successor-in-interest to Norden Laboratories, Inc.) (collectively SmithKline) move to disqualify plaintiff's English Feedlot (Feedlot) expert witness, Dr. Ned Brown (Brown) and its legal counsel, Holland & Hart. The issues are adequately briefed and oral argument will not materially aid their resolution. The parties have also submitted extensive affidavits and documentation concerning the factual matters raised here. The issues are submitted on the parties' papers. For the reasons set forth below, SmithKline's motion will be denied.

### I. BACKGROUND

This product liability action centers around SmithKline's cattle vaccine, *CattleMaster 4 (*CM4). Feedlot alleges that it administered *CM4 as part of its 1991 vaccination program and soon thereafter, many of its cattle became sick or died. Feedlot contends that the *CM4 vaccine is defective and SmithKline misrepresented that the vaccine would effectively protect its cattle from certain diseases. *CM4 is related to several vaccines—the CattleMaster 4 family. The four common CattleMaster 4 family components are: i) bovine respiratory syncytial virus (BRSV); ii) bovine virus diarrhea (BVD); iii) infectious bovine rhinotracheitis virus (IBR); and, iv) parainfluenza3 virus (P13).

### II. BROWN'S DISQUALIFICATION

SmithKline moves to disqualify Brown, an independent veterinary consultant, from acting as Feedlot's expert witness. It does so on conflict of interest grounds based upon Brown's relationship with SmithKline which predates this litigation.

Cases addressing this issue are rare. Therefore, not surprisingly, the parties cite no controlling authority. *See Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277 (S.D.Ohio 1988) (There is little case law dealing with expert witness disqualification). Even so, analogous authority points to the conclusion that Brown's disqualification is inappropriate because SmithKline did not disclose confidential information to Brown and even if such information was disclosed, SmithKline waived its confidentiality.

██ My analysis properly begins with a recognition of the court's inherent power to disqualify experts. *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F.Supp. 334, 336 (N.D.Ill.1990). The expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than attorneys. *See Id.* at 337. Experts are not advocates in the litigation but sources of information and opinions. *See also E.E.O.C. v. Locals 14 and 15, Intern. Union of Operating Engineers*, 1981 WL 163 (D.C.N.Y.) (rejecting blind application to experts of attorney disciplinary rules concerning client loyalty); *see also Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. at 281 (distinguishing reasons for disqualifying attorneys from experts because there are many communications between a client and an expert witness which are not privileged and there is less stigma attached to an expert 'changing sides' in the midst of litigation than an attorney, who occupies a position of higher trust). Because experts and attorneys perform different functions in litigation, the standards and presumptions applicable to the attorney-client relationship have no bearing on Brown's disqualification.

██ The party seeking disqualification bears the burden of establishing both the

existence of confidentiality and its non-waiver. *See generally Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C.1991). Here, SmithKline is the party seeking to disqualify Brown. Therefore, it bears the burden of proof. SmithKline contends that Brown, while retained by SmithKline, received confidential information regarding SmithKline's products, the components thereof, and SmithKline's defense and settlement strategies. SmithKline relies on five past consulting engagements as grounds for its motion: 1) 1984/1985 work in investigating and assisting in BRSV claim settlements (BRSV work); 2) 1985/1986 work conducted as an expert witness in the McCoy case (the McCoy case); 3) 1989 investigation concerning CattleMaster 4+VL5 vaccine (CM4+VL5 work); 4) 1990 investigation concerning *CattleMaster 4+L5 vaccine (*CM4+L5 work); and, 5) 1990/91 investigation concerning MLV IBR–L.Pomona vaccine (IBR work).

## A) CONFIDENTIALITY

■ Other jurisdictions have established a two-step inquiry to determine whether to disqualify an expert who had a prior relationship with a party. First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert? *Mayer v. Dell,* 139 F.R.D. at 3. Hence, if any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained (hence, any confidentiality was waived), or if, despite a relationship conducive to such disclosures, no significant disclosures were made, disqualification is inappropriate. *See Paul v. Rawlings,* 123 F.R.D. at 278.

### a) 1984/85 BRSV WORK

In 1984, SmithKline began receiving complaints that some livestock were contracting BVD after receiving BRSV vaccinations. The problem was traced to a contamination in the vaccine. BRSV was taken off the market until the problem was resolved. To avoid litigation, SmithKline retained fourteen outside veterinary consultants, including Brown, to investigate and to recommend settlement amounts.

SmithKline contends that Brown represented them in the BRSV investigations and Brown did not play a neutral role despite his "independent consultant" title. In his affidavit, Brown states that although SmithKline paid his fees, he functioned as an independent advisor to both SmithKline and complaining consumers. Brown states:

> [My] task was to meet with herd owners who had complained about the product; undertake on-site investigations; determine whether Norden's BRSV product was actually used; identify the product's serial number; evaluate the clinical disease occurring or which had occurred; and determine whether such disease related to the use of the product. If the product had been used and the disease occurring was related to the product, [I] then assisted the herd owner in working up a settlement calculation to present to SmithKline.

Brown also asserts that SmithKline never provided him with confidential information regarding its products' design, history, strengths or weaknesses. Brown further maintains that the information he received concerning the contaminated vaccine and SmithKline's settlement strategy was the same information revealed to the public.

■ In considering the first prong of the two-step inquiry, SmithKline had an objectively reasonable expectation that its communications to Brown would be kept confidential. Since SmithKline paid Brown to settle its consumer complaints, Brown was not an "independent consultant". Moreover, SmithKline instructed Brown to label his cover letter "Privileged and Confidential—Work Product" to prevent the claimant from acquiring this letter should a lawsuit result. Under these circumstances, SmithKline was objectively reasonable in concluding that Brown would keep its communications confidential.

■ As to the second prong, SmithKline did not disclose confidential information to Brown. Brown's communication with SmithKline flowed in one direction—from complaining consumers to him to SmithKline.

The only information which arguably went from SmithKline to Brown was the instruction packet for settling BRSV claims. However, this information, although labeled "Privileged & Confidential", was freely disseminated to the public via the fourteen consultants. Furthermore, any insight which Brown gained concerning SmithKline's settlement strategies was also publicly disclosed and, thus, not confidential.

Here, despite a relationship conducive to confidential disclosures, I find that SmithKline did not impart significant confidential disclosures to Brown. Therefore, Brown's 1984/85 BRSV work for SmithKline fails to provide sufficient grounds for his disqualification. *See Paul v. Rawlings,* 123 F.R.D. at 278.

### b) THE McCOY CASE

■ SmithKline also seeks to disqualify Brown based on his work in the McCoy case. SmithKline labels Brown as a "consulting expert" in McCoy and contends that Brown assisted them throughout the discovery phase and engaged in telephone conversations with its attorneys regarding trade secrets and potential liability issues. SmithKline further contends that Brown obtained information about Norden's financial condition, met with expert witnesses and attended strategy meetings.

Feedlot counters that Brown was a testifying expert rather than a consulting expert. Therefore, Feedlot argues, the opposition had full access to all of his communications with SmithKline's counsel. Brown also disputes SmithKline's argument and asserts that his role was to determine what factors, other than the vaccine, caused McCoy's problem. Brown further states that SmithKline never revealed any trade secrets or defects to him, other than what was publicly divulged.

First, SmithKline did not have an objectively reasonable expectation that its communications with Brown would be kept confidential. As evidenced by SmithKline's witness list in that case, Brown was a testifying expert, not a consulting expert. Under Fed. R.Civ.P. 26, the opposition is entitled to obtain information upon which a testifying expert intends to rely in formulating his opinions. Hence, the opposing party (McCoy) could discover Brown's communications with SmithKline. Since these communication were discoverable, it would be objectively unreasonable for SmithKline to expect that the information it provided Brown would be kept confidential.

Since SmithKline fails to meet the first component of the two-step analysis, the second—whether any confidential information was disclosed to Brown—need not be considered. *Mayer v. Dell,* 139 F.R.D. at 4. *See also Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246 (E.D.Va.1991) (disqualification likely inappropriate if response to either inquiry is negative). Consequently, I conclude that Brown's work in the McCoy case also fails to provide SmithKline with a sufficient basis for disqualification.

### c) CM4+VL5 work/*CM4+L5 work/IBR work

In each of the three remaining instances, SmithKline contends that Brown represented them in connection with his investigation of these complaints and that Brown did not play a neutral role despite his "independent consultant" title. In connection with this work, SmithKline again argues that Brown received confidential information concerning its products and SmithKline's defense and settlement strategies.

Brown's role in examining these complaints parallels his prior engagement in the BRSV investigation. Hence, I agree with SmithKline that it had an objectively reasonable expectation that its communications with Brown would be kept confidential. However, SmithKline is again unable to satisfy the inquiry's second prong. Like the BRSV investigation, Brown's communication with SmithKline flowed in but one direction.

Since SmithKline did not divulge confidential information to Brown during any of these three final engagements, SmithKline fails to sustain its burden of proving the existence of confidentiality. Accordingly, SmithKline's motion to disqualify Brown is unwarranted and, thus, denied.

## B) WAIVER

Even assuming arguendo that SmithKline disclosed confidential information to Brown during any of the above consulting engagements, SmithKline waived its confidentiality. First, Brown has published and frequently disseminated his critical opinions concerning SmithKline's products and SmithKline repeatedly acquiesced to such disclosures. Second, SmithKline failed to timely object to Brown's expert witness designation in a similar pending case.

SmithKline's assent to Brown's public disclosure of his critical views began in August of 1987 when Brown spoke to the Academy of Veterinary Consultants. Since then, Brown repeatedly made his opinions known through published papers, speeches and in conversations with various veterinarians in SmithKline's presence. At no time (other than now) has SmithKline asserted or even raised an objection to Brown's dissemination of this information on "confidentiality" grounds. Furthermore, in 1988, after Norden expressed dissatisfaction with Brown's critical views in a published article, Brown stated to Norden's counsel that he (Brown) was free to express opinions and that if SmithKline wanted to hire him permanently as an employee, rather than an independent consultant, they could make him an offer. Norden's counsel had no response.

Waiver is the intentional relinquishment of a known right or privilege. *In re Blinder Robinson & Co., Inc.,* 123 B.R. 900 (Bank.D.Colo.1991), *citing, Department of Health v. Donahue,* 690 P.2d 243, 247 (Colo. 1984). "A waiver may be explicit, . . .; or it may be implied, as, for example, when a party engages in conduct which manifests an intent to relinquish the right . . ., or acts inconsistently with its assertion." *Id.* Here, SmithKline repeatedly acquiesced to Brown's public criticism of its products. It is thus inconsistent, after impliedly relinquishing this right, for SmithKline to now assert that such information is confidential. Therefore, assuming arguendo SmithKline disclose confidential information to Brown, SmithKline waived its right to assert confidentiality at this late date.

Waiver is also evidenced by SmithKline's untimely objection to Brown's expert testimony in a similar lawsuit entitled Strange v. Norden Laboratories, Inc., No. 91–4135 (D.S.D.) (Strange). In January 1992, SmithKline was notified that Brown would testify for the opposing party in Strange. In his March 1992 Strange deposition, Brown revealed that he had previously served as SmithKline's consultant. However, SmithKline did not seek to disqualify Brown in Strange until Feedlot, in its response here, questioned the genuineness of SmithKline's confidentiality argument. Not surprisingly, SmithKline subsequently moved to disqualify Brown in Strange.

In its reply, SmithKline attempts to justify its untimely objection to Brown's designation. SmithKline contends it was unaware that Brown's past engagements with SmithKline were so extensive because Brown was evasive during his deposition. It further contends that Brown's important role was revealed only after reviewing documents relating to pointed discovery in this case. This argument is disingenuous.

First, Brown's answers during his deposition were responsive and complete. If SmithKline had any confidentiality concern, it could have been timely addressed. SmithKline had over eight months after Brown's deposition to move for his disqualification, but did not. SmithKline's untimely disqualification motion in Strange was a mere tactical maneuver. It does not manifest a genuine concern about confidentiality. Therefore, I conclude that SmithKline's failure to timely move for Brown's disqualification in Strange represents another implied assent to Brown's public dissemination of his critical views concerning SmithKline's products.

## C) PREJUDICE

In addition to the above analysis, a court should balance the competing policy objectives in determining expert disqualification. *See generally Paul v. Rawlings,* 123 F.R.D. at 282. The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process. *See Id.* at 277–78. The main policy objectives militating against

disqualification are ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling. *See Palmer v. Ozbek*, 144 F.R.D. 66, 67 (D.Md. 1992). Courts have also expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party. *See Paul v. Rawlings*, 123 F.R.D. at 281–82.

 SmithKline asserts that fundamental fairness and justice mandate Brown's disqualification because permitting him to testify would create an appearance of impropriety and compromise the proceedings by providing the opposition with confidential information. SmithKline also suggests that it funded Brown's ability to acquire his vast knowledge about its product and, thus, it would be unjust for Feedlot to benefit from such an expenditure. Feedlot counters that Brown's disqualification would work an unwarranted hardship on it because Brown is the preeminent independent consultant on *CM4's defectiveness—Brown has completed the most recent research and analysis on this subject. Feedlot further argues that there is no conflict of interest because SmithKline did not disclose confidential information to Brown.

After balancing the competing policy objectives, I conclude that justice will best be served by allowing Brown to testify for Feedlot. He is indisputably the leading expert on the issues in this case and SmithKline will suffer little, if any, prejudice in comparison to Feedlot. SmithKline disclosed no confidential information to Brown. Consequently, there is no conflict of interest nor will the integrity of judicial process be jeopardized. Moreover, it is undisputed that Brown is the most qualified expert to testify concerning the issues here. As such, his testimony can not retard the fact finding process. "Courts are generally reluctant to disqualify expert witnesses, especially those ... who possess useful specialized knowledge." *Palmer v. Ozbek*, 144 F.R.D. at 67.

In addition, Brown's affidavit reveals that he has acquired his expertise in this field through a variety of sources. Therefore, it would be unjust to allow SmithKline to preclude his testimony based on its limited prior engagement of Brown's services. Where, as here, public policy also fails to support Brown's disqualification, SmithKline's request to disqualify Brown is properly denied.

 Finally, nothing in this order is intended to suggest that either party or Brown acted inappropriately. However, it is worth noting that costly litigation of collateral issues concerning expert disqualification can be avoided. First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing. *Wang Laboratories, Inc., v. Toshiba Corp.*, 762 F.Supp. 1246, 1250 (E.D.Va. 1991). The writing should define clearly the consultant's confidentiality obligation. *Id.* If a consultant does not want to be bound by such confidentiality requirement, he should decline the engagement. *Id.* Similarly, counsel seeking to retain a consultant should inquire specifically whether the consultant's past employment presents any confidentiality problems. *Id.*

## III. DISQUALIFICATION OF HOLLAND & HART

SmithKline moves to disqualify Holland & Hart (H & H) from representing Feedlot on the grounds that Feedlot should not benefit from the information H & H received through Brown. I have determined that Brown should not be disqualified because he did not receive confidential information from SmithKline. Consequently, SmithKline's attempt to impute Brown's "taint" to H & H fails. Simply put, there is no "taint" to transfer.

SmithKline further moves for disqualification contending that a conflict of interest exists because H & H's Montana office represented SmithKline and/or its predecessors in connection with the 1984/85 BRSV contamination claims. Feedlot argues that H & H's limited work for SmithKline fails to meet the "substantially related" test as required for conflict of interest disqualification. Feedlot further contends that any confidences conceivably obtained during the prior represen-

tation cannot be imputed to Feedlot's current H & H attorneys. I agree with Feedlot.

 A motion to disqualify an attorney rests with the sound discretion of the trial court. *Federal Deposit Ins. Corp. v. Sierra Resources, Inc.,* 682 F.Supp. 1167, 1170 (D.Colo.1987). The moving party has the burden of showing sufficient grounds for disqualification. *Id.* Specific facts must be alleged and "counsel cannot be disqualified on the basis of speculation or conjecture...." *Id.* The District of Colorado has adopted the Colorado Rules of Professional Conduct as its standard of ethical conduct. D.C.Colo.LR. 83.6.

 Disqualification may be warranted when an attorney who previously represented one party agrees to represent that party's opponent in a later proceeding. Such conduct may violate Colorado Rule of Professional Conduct 1.9(a) which provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." Disqualification pursuant to Rule 1.9 is proper if:

1) an attorney-client relationship existed in the past;

2) the present litigation involves a matter that is "substantially related" to the prior litigation;

3) the present client's interests are materially adverse to the former client's interests; and,

4) the former client has not consented to the disputed representation after consultation.

Here, the presence of the first, third, and fourth factors are uncontested. H & H's Montana office represented SmithKline in 1985, adversity is obvious, and H & H did not inform SmithKline of this potential conflict. Therefore, disqualification here, turns on whether a substantial relationship exists between the pending suit and the matter in which H & H previously represented SmithKline.

## A) NO SUBSTANTIAL RELATIONSHIP EXISTS BETWEEN THIS CASE AND H & H'S 1985 WORK

 Substantiality is present if the factual contexts of the two representations are similar or related. *Graham v. Wyeth Lab.,* 906 F.2d 1419, 1422 (10th Cir.1990). Once the court finds a substantial relationship, an irrebuttable presumption arises that the client has revealed information to the attorney on the case that requires his disqualification. *Smith v. Whatcott,* 757 F.2d 1098, 1100 (10th Cir.1985). SmithKline's proof must enable "the court ... to reconstruct the attorney's representation of the former client, to infer what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client." *Koch v. Koch Industries,* 798 F.Supp. 1525, 1536 (D.Kan.1992).

 Here, SmithKline fails to meet its burden of establishing a substantial relationship between H & H's 1985 representation and this case. H & H's legal representation of SmithKline was provided exclusively by H & H's Montana office from February through June 1985. SmithKline was billed a total of $2,842.50 for approximately fifty-five hours. The only H & H attorney who worked on SmithKline's case still employed by H & H is Donald W. Quander. He billed one hour. Not surprisingly, Mr. Quander has no recollection whatsoever of that matter.

The services H & H rendered for SmithKline were limited to conducting lien searches related to the BRSV settlements. SmithKline, without H & H's assistance, had negotiated these agreements. SmithKline contends that during this limited engagement, H & H acquired background information concerning BRSV and SmithKline's settlement strategy and philosophy. However, the documentation SmithKline provides proves the contrary—H & H's work was limited to conducting lien searches and no confidential information concerning its products or settlement strategy was disclosed to H & H.

Where, as here, the reconstruction of H & H's prior representation of SmithKline reveals that no confidential information was

disclosed which has any relevance to this case, SmithKline fails to prove that disqualifying Feedlot's H & H counsel is appropriate. Accordingly, I exercise my discretion to deny SmithKline's motion to disqualify H & H.

## B) ASSUMING ARGUENDO THAT A SUBSTANTIAL RELATIONSHIP DOES EXIST, DISQUALIFICATION OF A FEW H & H ATTORNEYS DOES NOT DISQUALIFY THE ENTIRE FIRM

 Even assuming arguendo a substantial relationship between H & H's 1985 work for SmithKline and the current case, H & H's disqualification is still unwarranted. Under the ethical rules and applicable case law, any confidences conceivably obtained by H & H's Montana attorneys should not be imputed to H & H's attorneys in this case. Under Colorado Rule Professional Conduct 1.10(b), where the attorney who performed the earlier work has left the firm and no lawyer remaining in the firm has any material information relating to the representation, disqualification cannot be imputed to the firm as a whole.

Here, all H & H attorneys who represented SmithKline, except Mr. Quander, have terminated their H & H association. Mr. Quander, the one remaining attorney, has no material information relating to SmithKline's representation. Therefore, under Rule 1.10(b), disqualification of the H & H Montana attorneys is not imputed to H & H's Denver office.

 Moreover, the Tenth Circuit has recognized that the presumption of imputation to *all* lawyers within the firm is a rebuttable one. *SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 467–69 (10th Cir.1993). In determining whether the presumption of imputation has been rebutted, the court should consider the firm's size, structural divisions, likelihood of any contract between infected attorney and attorneys responsible for the present case, the existence of rules preventing the infected attorney from gaining access to files concerning the present litigation ... *Smith v. Whatcott*, 757 F.2d at 1101.

Applying those factors here, the presumption of imputation, if any, is rebutted. First, H & H is a large firm with multiple departments and offices. The work performed for SmithKline was handled exclusively out of H & H's Montana office, while H & H's Denver office is exclusively responsible for this case. Moreover, with the exception of Mr. Quander who is unable to recall the de minimis work he performed for SmithKline, there is little likelihood of contact between the "infected" attorneys and Feedlot's attorneys because they are no longer with H & H. Therefore, even if there is a substantial relationship between H & H's 1985 work for SmithKline and this case, Feedlot's current H & H counsel have successfully rebutted any imputed disqualification.

Accordingly, IT IS ORDERED that SmithKline's motion to disqualify Brown and Holland & Hart is DENIED.