**Ricky WYATT, by and through his aunt and legal guardian Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,**

**Diane Martin, et al., Plaintiff–Intervenors,**

v.

**Richard E. HANAN, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,**

**United States of America, Amicus Curiae.**

Civ. A. No. 3195–N.

United States District Court, M.D. Alabama, Northern Division.

Oct. 28, 1994.

See also, 868 F.Supp. 1356.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Ellen Harris, Mary Giliberti, Bazelon Center for Mental Health Law, James M. Lichtman, Ropes & Gray, Washington, DC, Kathryn H. Sumrall, Jackson, Garrison & Sumrall, P.C., Birmingham, AL, for plaintiff Ricky Wyatt, by and through his aunt and legal guardian, Mrs. W.C. Rawlins, Jr.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Ellen Harris, Mary Giliberti, Bazelon Center for Mental Health Law, James M. Lichtman, Ropes & Gray, Washington, DC, for plaintiffs Glenda Brandner, by and through her husband and legal guardian Wolfgang Brandner, David S. Schoel, by and through his father and legal guardian, J. Fred Schoel, Jr., Dr. D.A.R. Peyman, Joseph L. Moudry, Brenda N. Stacey, William Holden, Jr., and Amelia B. Heath, for themselves and all others similarly situated.

David Ferleger, Philadelphia, PA, Drew P. Baker, Reuben Wright Cook, Victoria Ann Farr, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, for intervenors-plaintiffs Diane Martin, Mary Beth Parker, William Smith, Adelia Keebler, Michael Guins, Richard Mills, Kim Smelley, Frankie Hopkins, Kenneth Cook and Wayne Williams.

Mary Elizabeth Culberson, Office of Atty. Gen., Alabama State House, Gregory Dale Crosslin, Robert E. Sasser, James Darrington Hamlett, Clifton E. Slaten, Charles Brinsfield Campbell, Patrick C. Davidson, Sasser & Littleton, P.C., June O. Lynn, G.R. (Rick) Trawick, Milton J. Westry, Dept. of Mental Health & Mental Retardation, Montgomery, AL, Ricky J. McKinney, Watson, Harrison & deGraffenried, Tuscaloosa, AL, for defendant Richard E. Hanan, as Com'r of Mental Health and State of Ala. Mental Health Officer.

Mary Elizabeth Culberson, Office of Atty. Gen., Alabama State House, Gregory Dale Crosslin, Robert E. Sasser, James Darrington Hamlett, Clifton E. Slaten, Charles Brinsfield Campbell, Patrick C. Davidson, Sasser & Littleton, P.C., June O. Lynn, G.R. (Rick) Trawick, Milton J. Westry, Dept. of Mental Health & Mental Retardation, Montgomery, AL, for defendants Henry Steagall, individually and in his capacity as Director of Finance for State of Ala., Tom Brassell, individually and in his capacity as Comptroller of State of Ala., Annie Laurie Gunter, individually and in her capacity as Treasurer of State of Ala. and Ken Wallis, as Receiver of mental illness and mental retardation operation.

Kenneth E. Vines, U.S. Atty's Office, Montgomery, AL, Deval L. Patrick, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, U.S. Dept. of Justice, Civil Rights

Div., Sp. Litigation Section, Washington, DC, for amicus curiae U.S.

## ORDER

MYRON H. THOMPSON, Chief Judge.

This longstanding litigation is again before the court, this time on the defendants' appeal, filed on September 2, 1994,[1] from an order entered by the United States Magistrate Judge on September 1, 1994,[2] holding that the plaintiffs' retained expert, Gerald Provencal, should not be disqualified—at least, for discovery purposes.[3] The defendants contend on appeal that Provencal should be disqualified for two broad reasons: first, because he had previously been retained by them and had entered into a confidential relationship with them; and, second, because of his character, that is, that he wrongfully removed some pages from some original documents belonging to the defendants, that an affidavit he submitted to the court is untrue, and that he acted unethically by accepting employment with the plaintiffs after having served as the defendants' confidential consultant. For reasons that follow, the court affirms the September 1 order of the magistrate judge.

## I. BACKGROUND

### A. First 20 Years of Litigation

In 1972, this court entered injunctions requiring the Alabama Department of Mental Health and Retardation to bring its facilities into compliance of certain minimal constitutional "standards." See Wyatt v. Stickney, 344 F.Supp. 373 (M.D.Ala.1972), aff'd in rele-

vant part, 503 F.2d 1305 (5th Cir.1974); Wyatt v. Stickney, 344 F.Supp. 387 (M.D.Ala. 1972), aff'd in relevant part, 503 F.2d 1305 (5th Cir.1974). Fourteen years later, on September 22, 1986, the court approved a consent decree which resolved the plaintiffs' and defendants' continued conflicts over the adequacy of the state's funding and administration of facilities under the court-ordered standards.[4] Modifications of the court-ordered standards have also been approved. See, e.g., Wyatt v. King, 793 F.Supp. 1058 (M.D.Ala.1992).

In 1991, a new round of litigation began. On January 18, 1991, the defendants brought a motion for a finding that they have met their obligations under the 1986 decree and for an order terminating this lawsuit, and, on January 22, 1993, the plaintiffs brought a motion to enforce the 1986 consent decree. Both motions are set for trial in January 1995.

### B. 1992 Settlement Efforts

In 1992, the parties attempted to enter into an agreement to establish formal procedures for settlement of the current round of litigation. At the urging of counsel for plaintiffs, defense counsel agreed to include in their settlement proposal that Provencal and another expert, Clarence Sundram, would serve as a consultant in the settlement process, but on the express condition that the two experts could not thereafter be used by plaintiffs. Provencal had served as an expert for plaintiffs in 1982 and 1983. Defense counsel wrote to plaintiffs' counsel that, "I am assuming that when Mr. Provencal and Mr. Sundram are involved in this process,

---

1. Doc. no. 89. The notation "Doc. no." indicates the file docket number given to a document. It is penciled in the right-hand bottom corner of a pleading and is entered on the docket sheet. Because of the large number of documents (pleadings and orders) being generated almost daily in this case, the court will attempt to identify a document by both its filing or entry date and its docket number. The clerk of the court did not begin giving documents a docket number until November 22, 1993.

2. The magistrate judge's order, although entered on September 1, was dated August 31 (Doc. no. 85).

3. In her September 1 order, the magistrate judge is unclear as to which motions filed by the parties are being addressed. It appears, however, that she is essentially denying the following motions to the extent they relate to Provencal: (1) the defendants' motion for protective order filed on July 28, 1994 (Doc. no. 60); (2) the defendants' second motion for protective order, filed on July 28, 1994 (Doc. no. 61); and (3) the defendants' supplemental second motion for protective order, filed on August 30, 1994 (Doc. no. 79).

4. The consent decree is reproduced at Wyatt v. Wallis, No. 3195–N, 1986 WL 69194 (M.D.Ala. Sept. 22, 1986).

their involvement will be considered as part of the settlement process and they will not be used as expert witnesses against the Department in future litigation regarding their involvement in this process." [5] Defense counsel continued that, "We will not agree to working with Mr. Provencal and Mr. Sundram in developing an agreed upon set of plans and standards and then run the risk of you using them as expert witnesses against the Department in future litigations." [6]

The plaintiffs' counsel responded that he could not agree to the last part of the proposal prohibiting the plaintiffs from using Provencal in the future. He wrote that, "Plaintiffs are agreeable to not retaining Clarence Sundram or Jerry Provencal as expert witnesses in the upcoming round of litigation (if it cannot be avoided), but we cannot agree that these two experts would be barred from testifying about what they know as a result of working with the Department and from giving opinions based on that knowledge." [7]

The plaintiffs and the defendants were unsuccessful in their efforts to reach an agreement establishing procedures for a settlement process.

### C. *1993 Settlement Efforts*

Later, in 1993, the parties made another attempt to reach an agreement establishing formal procedures for the possible settlement of this litigation. In August 1993, the parties executed a "Mental Retardation Outline for 90–day Agreement." [8] The purpose of the 90–day agreement was to provide a methodology by which the Commissioner of Mental Health and Mental Retardation could determine whether the Department should agree to a then-proposed settlement of the mental retardation aspect of this litigation. The 90–day agreement provided for the establishment of a "working team" and an "advisory committee." Under the agreement, the Commissioner appointed "a working team that would have two responsibilities: (a) to develop for the commissioner the information he requires to determine if the proposed MR settlement is feasible from a programmatic and financial point of view; and (b) to develop the three plans contemplated by the proposed settlement (community placement, quality improvement, and advocacy plans)." [9] The agreement also required the Commissioner to "appoint an advisory committee to consult with the working team." [10] The agreement further provided for the use of Provencal and Sundram as consultants. According to the agreement, "These two consultants may attend the meetings between the working team and advisory committee to provide direct input to the working team," and their "recommendations ... will be considered in developing final draft plans to be submitted to the Commissioner." [11]

The agreement further provided that the plaintiffs' attorneys were to have access to "information relevant to development of the plans" under the agreement, and that attorneys for both the plaintiffs and the defendants "may freely communicate with [the experts] so long as there is no ex parte communication." [12] The 90–day agreement

---

5. The defendants' brief filed on September 6, 1994 (Doc. no. 93), exhibit G (letter from G.R. Trawick to Ira Burnim, dated November 25, 1992).

6. *Id.*

7. *Id.* (letter from Ira Burnim to G.R. Trawick, dated December 7, 1992). The plaintiffs' counsel explained that,

> "If plaintiffs agree to the negotiation process outlined in your and my letters, plaintiffs take the risk, if the negotiation fails, that we will have futilely delayed raising our claims with the Court and enforcing class members' rights. Defendants take the risk that, if negations fail, they will have permitted two experts to gain sufficient knowledge about their system that their testimony will be of interest of the Court.

> It seems to me that there is an equivalence of risk, and, in addition, a proper relationship between the two. What plaintiffs give up by agreeing to negotiate is the opportunity to do discovery. What defendants give up by agreeing that Clarence Sundram and Jerry Provencal can testify is the ability to take advantage of plaintiffs' forg[o]ing discovery during negotiations." *Id.*

8. Filed on September 26, 1994 (Doc. no. 143).

9. *Id.* at 1.

10. *Id.*

11. *Id.* at 1–2.

12. *Id.* at 4.

did not expressly restrict the plaintiffs' future use of Provencal.

The agreement failed to result in a settlement of this litigation.

### D. *Litigation Resumes in 1994*

In early July 1994, the plaintiffs retained Provencal again as their own expert.[13] Provencal's duties and activities included touring and inspecting facilities of the Alabama Department of Mental Health and Mental Retardation.[14] On July 28 and August 30, 1994, the defendants filed motions with the magistrate judge contending that she should disqualify Provencal as an expert for plaintiffs.[15] By order entered on September 1, the magistrate judge held that the plaintiffs could continue to use Provencal as an expert "for discovery purposes."[16] On September 2, the defendants appealed to this court contending that Provencal should be disqualified for two reasons: first, because he had previously been retained by them and had entered into a confidential relationship with them; and, second, because of his character, that is, that he wrongfully removed some pages from some original documents belonging to the defendants, that an affidavit he submitted to the court is untrue, and that he acted unethically by accepting employment with the plaintiffs after having served as the defendants' confidential consultant.[17]

## II. DISCUSSION

### A. *Standard of Review*

This court may not modify or set aside a magistrate judge's ruling on a non-dispositive issue, such as the one now pending before the court, unless the ruling is clearly erroneous or contrary to law. 28 U.S.C.A. § 636(b)(1)(A); Fed.R.Civ.P. 72(a).

### B. *Confidential Relationship*

■ Both the plaintiffs and the defendants agree that, under appropriate circumstances, a court has the inherit power to disqualify an expert from participating in litigation before it. *See, e.g., English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498, 1501 (D.Colo.1993); *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1248 (E.D.Va.1991); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988). In deciding whether to disqualify a party's expert, a court should be informed by a number of factors, including the following: first, whether the other party had a confidential relationship with the expert; second, whether it was objectively reasonable for the other party to believe that it had such a relationship; and, third, whether the other party did, indeed, disclose confidential information to the expert. *English Feedlot*, 833 F.Supp. at 1502; *Palmer v. Ozbek*, 144 F.R.D. 66, 67 (D.Md.1992); *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C.1991); *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. at 1248; *Paul*, 123 F.R.D. at 278; *see also Wang Laboratories, Inc. v. CFR Associates, Inc.*, 125 F.R.D. 10 (D.Mass.1989); *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D.Minn.1986).

i.

■ Guided by these concerns, the court is convinced that the defendants did not estab-

---

**13.** Plaintiffs' brief filed on September 19, 1994 (Doc. no. 125), exhibit A, ¶ 7.

**14.** *Id.*

**15.** Doc. nos. 60, 61, and 79.

**16.** Doc. no. 85. The magistrate judge stated that her ruling was for *"discovery purposes only*, and that the district judge would consider whether evidence from Provencal or others regarding his expert services is *admissible* at [trial]." *Id.*

**17.** Doc. no. 89. This is actually the second appeal in which the plaintiffs' retention of Provencal as an expert has been an issue. On August 24, 1994, the defendants filed an emergency appeal regarding whether plaintiffs' experts, includ-

ing Provencal, should be allowed to tour and inspect the facilities of the Department of Mental Health and Mental Retardation. Doc. no. 73. During an August 24 hearing on the appeal, the defendants challenged a number of oral rulings by the magistrate judge allowing Provencal to serve as the plaintiffs' expert for discovery purposes. Transcript of August 24, 1994, in-chambers hearing, filed on September 14, 1994. Because, as agreed by the defendants, the magistrate judge had not reduced her earlier oral rulings to writing, *see* Rule 72(a) of the Federal Rules of Civil Procedure, the court entered an order on August 26 dismissing the appeal "without prejudice to the right of the defendants to seek further review of the issues raised in the appeal after entry of the appropriate orders by the United States Magistrate Judge." Doc. no. 75.

lish a confidential relationship with Provencal and that they had no reasonable basis to believe that they had such a relationship. During their 1992 settlement discussions, counsel for both the plaintiffs and the defendants expressly discussed whether, if Provencal served as a consultant to both sides in their settlement efforts, he should be allowed to participate in future litigations as an expert on behalf of the plaintiffs. The plaintiffs and the defendants were, however, unsuccessful in incorporating their discussions into an agreement acceptable to all. Instead, they later entered into the 1993 90–day agreement, which notably did not contain such a restriction. The court is convinced, in light of the parties' express discussions in 1992 about placing restrictions on Provencal's participation in future litigations and in light of the absence of any such restriction in the later executed 1993 90–day agreement, that both the plaintiffs and the defendants fully understood in 1993 that there would be no such restriction.[18]

This conclusion is reinforced by a detailed reading of the 90–day agreement itself. First, the agreement provides that the plaintiffs counsel shall have access to "information relevant to development of the plans" under the settlement process.[19] Under this provision, counsel for plaintiffs had the right to all information generated by the 90–day agreement, conceivably including that generated and obtained by Provencal.[20] Second, the agreement provided that counsel for both plaintiffs and defendants "may freely communicate with [the experts] so long as there is no ex parte communication."[21] Therefore, plaintiffs' counsel—as long as they were accompanied by defendants' counsel—had the right to complete access to Provencal and thus to all the information he had acquired. These provisions are inconsistent with any understanding that defendants had a relationship with Provencal that included the exchange of confidential information—that is, information that could not be made available to plaintiffs without defendants' permission.

The defendants point to a memorandum, dated December 2, 1993, from Associate Commissioner Billy Ray Stokes to Provencal, stating that "I will appreciate it if you, as our *consultant* for this planning process, will send me a written statement indicating your support of the MR plans."[22] The defendants also note that, in an affidavit submitted to the court, Associate Commissioner Stokes states that "Provencal was previously *retained* by Defendants to provide consultation with regard to the 90 Day Plan."[23] The court does not take issue with the defendants' contention that Provencal was "retained" as a "consultant" by them pursuant to the 1993 90–day agreement. However, the critical question is not whether Provencal was "retained" as a "consultant" but rather whether he was retained as a "confidential" one. As shown above, the agreements and the events leading up to its formation reflect that he was not.

Finally, the court believes that there are compelling practical reasons for reaching the conclusion that it does. These reasons dictate that, absent compelling equitable reasons to the contrary, any substantial ambiguity regarding whether there is a confidential relationship between an attorney and an expert should be resolved against the attorney seeking to invoke the relationship. First, lawyers are in the best position to develop-

---

18. The defendants rely on the 1992 correspondence between their counsel and plaintiffs' counsel to support their contention that in 1993 they had a confidential relationship with Provencal restricting his future use by plaintiffs. However, as the defendants must surely know, the 1992 correspondence did not result in an agreement. Instead, the parties reached a later, separate agreement in 1993, an agreement which notably did not restrict plaintiffs' future use of Provencal.

19. Doc. no. 143.

20. This conclusion is particularly compelling because counsel for plaintiffs expressly rejected, during the 1992 settlement efforts, any effort by the defendants to place a restriction on what Provencal might learn as a consultant in the settlement process. The defendants' brief filed on September 6, 1994 (Doc. no. 93), exhibit G, (letter from Ira Burnim to G.R. Trawick, dated December 7, 1992).

21. Doc. no. 143.

22. The defendants' brief filed on September 6, 1994 (Doc. no. 93), exhibit B (emphasis added).

23. *Id.*, exhibit A ¶ 3 (emphasis added).

ment mechanisms to assure that both they and the expert have a clear and unambiguous understanding that a confidential relationship has been created. They are the "repeat players," the ones who will continually face the problem. Second, lawyers have the legal background and experience enabling them to anticipate possible problems in the future. They know the rules by which everyone must play. Therefore, because lawyers seeking to invoke the confidential relationship have the knowledge, experience, and the ability to avoid the conflict, it is appropriate that the consequences for failing to take the necessary precautionary measures should fall upon them. See Wang Laboratories, Inc., 762 F.Supp. at 1248 ("Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended"); cf. Green v. Montgomery County, Ala., 784 F.Supp. 841, 846 (M.D.Ala.1992) (similarly finding that lawyer is in best position to develop mechanisms to avoid ethical conflicts with potential as well as existing clients). Therefore, if the defendants had desired a confidential relationship with Provencal, they should have included provisions in the 90–day agreement expressly providing for such a restriction.[24]

### ii.

The court further rejects the defendants' contention that Provencal was privy to privileged and confidential information that he could likely use on behalf of the plaintiffs. The defendants point to three items that they contend support their contention that Provencal received privileged information: first, a memorandum, dated December 2, 1993, from Provencal to Associate Commissioner Stokes, inclosing a plan for "settlement considerations" by the Commissioner;[25] second, a memorandum dated November 5, 1993, from Provencal to another mental health official commenting on "draft[26] documents"; and, third, an affidavit from associate commissioner Stokes stating that:

"As a member of the 90 Day Plan, Mr. Provencal was privy to confidential information which is the property of the Alabama Department of Mental Health and Mental Retardation."

\*　　\*　　\*　　\*　　\*　　\*

"Private consultation meetings took place wherein Mr. Provencal was privy to and was later given copies of 90 day plan documents which are subject to Defendants' prior objections."[27]

As to the two memoranda, they were not marked confidential. In addition, they were generated as a part of the 90–day agreement and, as a result, the plaintiffs, along with Provencal, had full access to them. Finally, associate commissioner Stokes's statements—that Provencal received confidential or privileged information—are not credible. The statements are, at most, only conclusory. But more importantly, Associate Commissioner Stokes knew that any information furnished to Provencal during the during the 90–day agreement could also be made available to counsel for plaintiffs.[28]

### iii.

The defendants suggest that the mere "threat or potential threat that confidences

---

**24.** This is not to say that the relationship between an attorney and an expert must always be reduced to a formal contract. See Paul, 123 F.R.D. at 278. Admittedly, however, a contract that clearly defines the relationship, including the confidential aspect, would provide the best assurance against future conflicts.

In addition, although the court has, by analogy, drawn upon the law regarding attorney-client relationships, the court should not be understood as implying that the law on attorney-client relationships applies wholesale to attorney-expert relationships. The two relationships implicate different interests and concerns. English Feedlot, Inc., 833 F.Supp. at 1501.

**25.** The defendants' brief, filed on September 6, 1994, (Doc. no. 93), exhibit B.

**26.** The defendants' brief, filed on September 26, 1994 (Doc. no. 147), exhibit C.

**27.** The defendants' brief, filed on September 6, 1993 (Doc. no. 93), exhibit A, ¶¶ 7–8.

**28.** The court's conclusion that the information Provencal received does not disqualify him does not mean that such information is admissible at trial. Rule 408 of the Federal Rules of Evidence limits the admissibility of "conduct or statements made in compromised negotiations." Therefore, the admissibility of any settlement negotiations is a separate issue which the court does not address at this time.

may be disclosed" requires disqualification of an expert. *Marvin Lumber & Cedar Co.*, 113 F.R.D. at 591. Any doubt, according to the defendants, should be resolved in favor of the defendants. This argument is based on drawing an analogy between when attorneys should be disqualified and when experts should be disqualified because of receipt of confidential information. Courts, however, differ regarding whether expert disqualification is directly analogous to attorney disqualification. *Compare, e.g., English Feedlot, Inc.*, 833 F.Supp. at 1501 (expert disqualification differs substantially from attorney disqualification because of the different function that attorneys and experts serve) *with Marvin Lumber & Cedar Co.*, 113 F.R.D. at 591 (test for attorney disqualification applied to the issue as to whether experts should be disqualified). Because the issue presented is so limited, this court declines to reach any broad conclusion as to the extent to which the law regarding attorney disqualification may be applied to expert disqualification.[29]

In any event, the court is convinced that, in this case, there was no threat or potential threat that confidences would be disclosed to Provencal as a part of the 90–day agreement. As the court has explained, the defendants fully understood that the information furnished to Provencal could not be kept confidential and that the plaintiffs could conceivably use him in future litigation.

#### iv.

Finally, the court concludes that a balancing of the competing interests compels the conclusion that it reaches. *See English Feedlot, Inc.*, 833 F.Supp. at 1504–05; *Paul*, 123 F.R.D. at 281–82. Provencal is an expert in the field of mental retardation and has had a long standing relationship with the plaintiffs. At this stage of these proceedings, it would be an undue burden—indeed it would be unfair—to require that the plaintiffs retain another expert who would then have to familiarize herself or himself with the details of this case. Moreover, the evidence is clear that the defendants never understood that

the information furnished to Provencal would be kept confidential and never understood that Provencal could not be used as an expert by the plaintiffs in the future. The plaintiffs' retention of Provencal for the current round of litigation will not in any way prejudice defendants.

#### C. *Provencal's Character*

■ The defendants contend that Provencal should be disqualified for the following reasons: first, he wrongfully removed some pages from some original documents belonging to the defendants; second, his testimony in an affidavit submitted to the court is untrue; and, third, he acted unethically by accepting employment with the plaintiffs after having participated as a consultant in the 90–day agreement.

As to the first issue, the court finds that Provencal took the pages from the documents, but only by mistake. Because the pages were available through discovery, he had no reason to take them intentionally without permission. Also, the pages were eventually returned to the defendants and the defendants were in no manner prejudiced or harmed by Provencal's innocent actions. Provencal should not be disqualified for this reason.

As to the second issue, the court finds that Provencal's testimony in his affidavit does not warrant his disqualification. The defendants contend that Provencal was untruthful when he stated in his affidavit that, "The record material was provided as I requested, however, professional staff at [Glenn Ireland Developmental Center] declined to be interviewed at all."[30] They point to what they contend is a contrary affidavit from the Director of Habilitation Services at the Center, stating that the Director "had the opportunity to meet with an expert from the Plaintiffs' team, at which time we discussed various information with regard to the Glenn Ireland Developmental Center."[31] The court agrees with the plaintiffs that these two affidavits do not necessarily conflict. Provencal's affidavit could be understood to state that the Center

**29.** *See supra* note 24.

**30.** The plaintiffs' brief, filed on September 19, 1994 (Doc. no. 125), exhibit A, ¶ 9.

**31.** The defendants' brief, filed on September 26, 1994 (Doc. no. 147), exhibit F.

staff refused to talk to him, and the Director's affidavit could be understood to state that he talked to the plaintiffs' experts but not necessarily to Provencal. In any event, to the extent that a conflict can be inferred, the conflict does not warrant Provencal's disqualification. Rather, the issue is, if anything, one of credibility at trial: that is, whether Provencal is being untruthful or the Director of the Center is.

Finally, as to the third issue raised by the defendants—that Provencal acted unethically in accepting employment with the plaintiffs—the court finds no basis for disqualification. For the reasons already given, the court finds that Provencal did not have a confidential relationship with the defendants and that he did not receive any confidential or privileged information from them. By accepting employment with the plaintiffs, Provencal did not act unethically.

Accordingly, upon consideration of the appeal filed by the defendants on September 2, 1994,[32] and for the above reasons, it is ORDERED that the order of the United States Magistrate Judge entered on September 1, 1994[33]—denying the motions filed by defendants on July 28 and August 30, 1994,[34] to the extent said motions seek the disqualification of the plaintiffs' expert, Gerald Provencal—is affirmed.[35]

---

32. Doc. no. 89.

33. Doc. no. 85.

34. Doc. nos. 60, 61, and 79.

35. During the hearing held on September 26, 1994, the parties agreed that the court could resolve the issue of whether Provencal should be disqualified, based on affidavits and other documents and briefs and without an evidentiary hearing. This agreement was based on a further understanding that the findings the court makes today are preliminary only and that, at the request of any party, the court will allow the parties to present additional evidence at the trial on the issue of disqualification and will then reconsider the issue anew. Any request of the court to reconsider the issue anew at trial should be made in writing by no later than December 1, 1994.