United States Court of Appeals,

Fifth Circuit.

No. 94-30509.

KOCH REFINING COMPANY, Plaintiff,

v.

JENNIFER L. BOUDREAUX MV, her engines, boiler, etc., in rem., et al., Defendants.

In re in the Matter of JENNIFER L. BOUDREAUX MV and Ocean Towing Service, Inc., as owners of the MV Jennifer L. Boudreaux praying for exoneration from and/or limitation of liability:  Ocean Towing Service, Inc., Appellant-Cross-Appellee,

and

G & B Marine, Inc., Third-Party-Defendant-Appellant, Cross-Appellee,

v.

CONTINENTAL INS., CO., 5801 Associates, Ltd., and Ocean Transport Corp., Claimants-Appellees-Cross-Appellants.

In re in the Matter of OCEAN TRANSPORT CORPORATION, as owner pro hac vice of the barge Ocean Transporter praying for exoneration from or limitation of liability:  Ocean Transport Corp., et al., Third-Party-Plaintiffs,

Ocean Transport Corp., Third-Party-Plaintiff-Appellee, Cross-Appellant,

v.

G & B MARINE, INC., et al., Third-Party-Defendants-Appellants, Cross-Appellees,

5801 ASSOCIATES, LTD., et al., Plaintiffs,

v.

CONTINENTAL INSURANCE COMPANY, Defendant.

June 25, 1996.

Appeals from the United States District Court for the Eastern District of Louisiana.

1

Before POLITZ, Chief Judge, and JONES and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case arises out of the 1987 sinking of a barge, the T/B OCEAN TRANSPORTER ("the barge"), while in the tow of the M/V JENNIFER L. BOUDREAUX ("the tug"). After a bench trial, the district court found the tug 2/3 liable and the barge 1/3 liable, and awarded the barge's owners $2.67 million. Both parties now appeal the judgment. Two issues seem to us most worthy of discussion: the court's decision to disqualify Richard Vinas as an expert witness, and the denial of prejudgment interest. Upon consideration of these issues and the others raised by the parties, however, we affirm.

## I. BACKGROUND

The barge was owned by 5801 Associates, Ltd. ("5801"). It had been constructed in 1979 and was extended in 1980 by the addition of a notch extension to its stern. In 1986, 5801 bareboat chartered the barge to Ocean Transport Corporation ("OTC"). In 1987, OTC procured a charter from Koch Chemical Corporation ("Koch") to transport paraxylene from Corpus Christi, Texas to Wilmington, North Carolina. OTC hired Ocean Towing Services, Inc. ("Ocean Towing") to tow the barge to Wilmington. Ocean Towing owns the tug and is an affiliate of G & B Marine Service, Inc. ("G & B") (G & B and Ocean Towing are collectively referred to as "the tug interests").

On November 24, 1987, the JENNIFER L. BOUDREAUX left Corpus Christi with the barge in tow. She was initially under orders to

2

rendezvous off Galveston, Texas with another tug, the AMERICAN PATRIOT, so this second tug could tow the barge to Wilmington. However, the AMERICAN PATRIOT developed engine problems, and Todd Lyons, the secretary/treasurer and comptroller of G & B, determined that the JENNIFER L. BOUDREAUX could make the entire voyage. At that time, he directed the JENNIFER L. BOUDREAUX to proceed to Wilmington and to stop for fuel in Miami, Florida. Lyons later determined the Miami stop was not necessary, and instructed the tug to proceed directly to Wilmington and to follow a course in the Gulf Stream to save time and fuel.

Neither the tug's captain or crew had ever been in the Atlantic north of Jacksonville, Florida. The only chart on board showed the coastline from Brownsville, Texas to Charleston, South Carolina. It did not depict their final destination of Wilmington and did not detail ports along the East coast. Although detailed charts were available en route, the crew did not attempt to obtain them.

On December 3rd, the tug received several gale warnings, due to an approaching cold front, from the National Weather Service. Winds of 30-40 knots and seas of 8-14 feet were forecast for the following afternoon and evening. The tug reported them to Lyons. He advised the tug that the weather system would move away from it, and directed it to remain on course in the Gulf Stream. Later that evening, weather conditions began to deteriorate as the gale approached. Despite the steadily worsening weather, the tug reduced its speed but continued in the Gulf Stream. The tug

3

received several more gale warnings that night.

The next day, December 4th, the tug encountered, exactly as forecasted, winds of 25 to 35 knots and seas of 12 to 14 feet with occasional 20 foot swells. The weather conditions in the Gulf Stream were significantly worse than those closer to shore. On December 3rd and 4th, the maximum seas halfway between the Gulf Stream and the shore were 10 feet. Within ten miles of the shore, the seas reached a maximum of 4 feet.

During the storm, the barge was constantly splashed with water and rolled from side to side. It frequently plowed beneath 20 foot swells. The barge's deck and raised trunk were continually covered with water from approximately noon on December 3rd to 8:00 p.m. on December 4th.

At that time, the tug was hit by a series of large waves and the tow line snapped. The crew attempted to retrieve the barge, but could not because the tug's shackle, which connected the tow line to the barge's bridge, had broken. For about an hour, the barge rolled from side to side as it was pounded by waves. Gradually, it began to sink, and finally sank completely around midnight on December 6th. The barge was then in waters 200 fathoms deep and was 120 miles from shore. Neither the barge nor its cargo has been recovered.

The expected lawsuits were filed: 5801 and OTC sued the barge's insurer, Continental Insurance Company ("Continental"); the cargo owner Koch sued Ocean Towing and G & B; Ocean Towing and G & B sued for limitation of liability; and OTC, 5801, and

4

Continental sued for limitation of liability (Continental, 5801, and OTC are collectively referred to as "the barge interests"). The cases were consolidated.

Koch settled its claims before trial. In May 1993, 5801, OTC, and Continental also settled their dispute and agreed to assert a joint claim for the barge's loss, leaving two (consolidated) cases for trial. The barge interests were suing the tug interests for negligent towing, seeking to recover for the barge's loss. In turn, the tug interests were suing for limitation of liability and to recover towage fees and related expenses.

After the bench trial in September 1993, the district court found the tug interests to be 2/3 at fault and the barge interests to be 1/3 at fault for the barge's sinking. It awarded the barge interests $2.67 million, but denied pre-judgment interest on the award. The district court denied the tug interests' claims for limitation of liability and towage fees.

Both parties timely appealed and cross-appealed the judgment. The tug interests argue the district court 1) abused its discretion in disqualifying expert witness Richard Vinas; 2) abused its discretion in permitting expert Norman Antrainer to testify about the barge's value; 3) erred in finding the tug breached its duties of seaworthiness and care; 4) erred in denying their petition for limitation of liability; and 5) erred in denying towage fees. The barge interests argue the district court 1) clearly erred in finding the barge unseaworthy; and 2) abused its discretion in denying pre-judgment interest.

5

## II. DISCUSSION

A. Disqualification of Richard Vinas

The tug interests contend the district court erred in disqualifying expert witness Richard Vinas.[1] Vinas had originally been retained as an expert by Continental in its insurance dispute with 5801 and OTC. Continental paid him approximately $8000, received two detailed written reports of his opinions, and listed him as a "will call" expert for the scheduled August 1990 trial date. This date was suspended. It is not clear when Continental released him.[2] At trial three years later, Vinas remained listed as a "will call" expert by the barge interests, although they rested without calling him.

On September 23, 1993, the barge interests discovered that the tug interests had made *ex parte* contacts with Vinas and had apparently retained him in August 1993. The following day, the barge interests moved to disqualify Vinas as a witness and to sanction the tug interests for their actions. The district court heard argument, and, after reviewing memoranda from both sides, disqualified Vinas. It concluded Continental had retained Vinas, had provided him with confidential information, and "[had] not

---

[1]Additionally, the tug interests' brief alleges the district court improperly did not allow them to arrange *ex parte* meetings with expert witnesses A.J. Herkes, Norman Antrainer, and Ed Shearer. We do not address this issue because it was not developed on appeal.

[2]Continental contends it discharged Vinas in May 1993, after the insurance dispute with 5801 and OTC was settled. The tug interests contend Continental discharged him in the summer of 1990.

6

release[d] Vinas to use the information he had compiled and received in his work on the case." The tug interests appeal Vinas's disqualification.

Federal courts have the inherent power to disqualify experts, *Campbell Ind. v. M/V GEMINI,* 619 F.2d 24, 27 (9th Cir.1980), although cases that grant disqualification are rare, *English Feedlot, Inc. v. Norden Lab., Inc.,* 833 F.Supp. 1498, 1501 (D.Col.1993). Initially, we point out that this is not a case in which the expert switched sides. If that were the case, "no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification." *Wang Lab., Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991) (citations omitted). However, in the instant case, it was Continental that switched sides, not Vinas. Continental had retained Vinas to be an expert in its insurance coverage dispute with 5801 and OTC. After the dispute was settled, Continental changed its position and joined 5801's and OTC's side against the tug interests.

In disqualification cases other than those in which the expert clearly switched sides, lower courts have rejected a "bright-line" rule and have adopted the following test:

First, was it objectively reasonable for the first party who claims to have retained the expert to conclude that a

7

confidential relationship existed?

Second, was any confidential or privileged information disclosed by the first party to the expert?

*Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C.1991) (reviewing cases). *See also Palmer v. Ozbek,* 144 F.R.D. 66, 67 (D.Md.1992). Only if the answers to both questions are affirmative should the witness be disqualified. *Mayer,* 139 F.R.D. at 3. Many lower courts have considered a third element: the public interest in allowing or not allowing an expert to testify. *E.g., English Feedlot,* 833 F.Supp. at 1504-5; *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F.Supp. 334, 336-37 (N.D.Ill.1990).

The party seeking disqualification bears the burden of proving these elements. *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J.1994). We review the district court's decision for an abuse of discretion. *English Feedlot,* 833 F.Supp. at 1501-2.

Initially, a court must determine whether the retaining party and the expert had "a relationship which permitted [the retaining party] reasonably to expect that any communication ... would be maintained in confidence by [the expert]." *In re Ambassador Group, Inc. Litigation,* 879 F.Supp. 237, 243 (E.D.N.Y.1994). Lower courts have found such a relationship to exist when "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like." *Marvin Lumber Co. v. Norton,* 113 F.R.D. 588, 591 (D.Minn.1986). *See also Wang Lab.,* 762 F.Supp. at 1249, n. 4 (collecting cases); *Cordy,* 156 F.R.D. at 581. By contrast,

when "the expert met but once with counsel, was not retained, was not supplied with specific data relevant to the case, and was not requested to perform any services, [ ] reviewing court[s] [have] found that the evidence supports the finding that the meeting was a type of informal consultation rather than the commencement of a long-term relationship." *Mayer,* 139 F.R.D. at 3-4 (internal quotations and citations omitted). *See also Wang Lab.,* 762 F.Supp. at 1249, n. 5 (collecting cases); *Nikkal Ind., Inc. v. Salton,* 689 F.Supp. 187, 190 (S.D.N.Y.1988).

In the instant case, the district court did not clearly err in finding that Continental had a reasonable expectation of confidentiality with Vinas and that such expectation continued after Vinas was "discharged" by Continental. Their relationship is more aptly described as a "long-standing series of interactions" than an initial consultation. Continental paid Vinas $8000 and had received several written reports from him.

The court must next determine whether Vinas received, or had reasonable access to, confidential information. Such information would include "discussion of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Mayer,* 139 F.R.D. at 4. However, purely technical information is not confidential. *Nikkal Ind.,* 689 F.Supp. at 191-92.

Continental contends its counsel "spent considerable time with

9

Mr. Vinas explaining his entire theory of the case as well as trial tactics for the 1990 trial." It also contends the counsel "furnished Mr. Vinas with documents that had been generated in preparation for the trial of this matter and participated in the formulation of graphics by Mr. Vinas." The tug interests asserted that Vinas's knowledge was limited to technical information about the barge's condition. The district court found Vinas did receive confidential information. Given the competing arguments, this finding is not clearly erroneous.

The tug interests contend that Continental abandoned any claim to confidentiality after designating Vinas as a "will call" witness whose report was circulated among the parties in 1990. The tug interests believe they could have dispelled any notion that Continental divulged confidential information to Vinas had the court allowed an evidentiary hearing on the disqualification motion. In some situations, a hearing may be required, but this was not one of them. The substance of Vinas's report clearly revealed that, had he not been a "will call" witness, it would have embodied confidential disclosures. But although he was originally designated a "will call" witness, it should have become clear by May 1993, when Continental switched sides, that Continental no longer desired to put into evidence his report on the cause of the sinking. During the three-year hiatus from 1990 to 1993, moreover, no party had an incentive to pursue Vinas's testimony, so his designation as a "will call" witness became immaterial. The tug interests could have deposed Vinas at any time, of course. All of

10

these facts were sufficiently evident to the trial court to render an evidentiary hearing superfluous, especially in the late stages of trial.

Lower courts have also "balance[d] the competing policy objectives in determining expert disqualification." *English Feedlot,* 833 F.Supp. at 1504. "The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process." *Id.*

"The main policy objectives militating against disqualification are ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling." *English Feedlot,* 833 F.Supp. at 1504-5. "Courts have also expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party." *Id.* at 1505. Accordingly, courts have considered whether another expert is available and whether the opposing party had time to hire him or her before trial. *E.g., Wyatt v. Hanan,* 871 F.Supp. 415, 422 (M.D.Ala.1994); *Cordy,* 156 F.R.D. at 582.

In this case, the district court noted that the tug interests could have secured their own naval architect in June 1990, over three years before trial. While the tug interests suggest that Continental manipulated the pretrial witness list to "keep him away" from them, the tug interests did not even allege in response to the disqualification motion that they certainly intended to call

11

Vinas. The contention of dependency on his testimony rings somewhat hollow in light of that coyness.

Moreover, we are troubled that the tug interests did not directly notify their opponents before trial that they would be calling Vinas to testify. Instead, counsel for the tug interests made several *ex parte* contacts with Vinas and apparently employed him as their consultant in August 1993, but the barge interests only accidentally learned of this arrangement after their side had rested.

We conclude the district court did not abuse its discretion in disqualifying Vinas under this very limited and specific factual scenario.

B. Denial of Pre-Judgment Interest

The barge interests contend the district court abused its discretion in denying pre-judgment interest on their $2.67 million award. The district court gave two reasons for its denial: 1) the fact that both parties were at fault for the barge's sinking; and 2) the extraordinary delays in the trial due to the insurance dispute among the barge interests and the reassignment of the case from Judge Collins to Judge Heebe. Weighing against the denial of prejudgment interest, the court also noted the $2.67 million award was not substantially less than the amount sought by the barge interests.

In maritime cases, an award of pre-judgment interest is the rule rather than the exception. *Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F.2d 1149, 1157 (5th Cir.1990). "Despite admiralty's

12

traditional hospitality to pre-judgment interest, however, such an award has never been automatic." *City of Milwaukee v. National Gypsum Co.,* --- U.S. ----, ----, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995). The Supreme Court has explained that "the allowance of interest on damages is not an absolute right. Whether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury." *Id.* (internal quotations and citations omitted). Nevertheless, a court has the discretion to deny pre-judgment interest "only when there are "peculiar circumstances' that would make it inequitable for the losing party to be forced to pay pre-judgment interest." *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir.1980) (footnote omitted). *See also Milwaukee,* --- U.S. at ----, 115 S.Ct. at 2095 (summarizing circuit courts). We review the district court's finding of peculiar circumstances for clear error, and its denial of pre-judgment interest based on those circumstances for an abuse of discretion. *Orduna,* 913 F.2d at 1157.

The district court's first reason for denying pre-judgment interest was that both parties were at fault for the barge's sinking. Contrary to the argument made by the tug interests, the Supreme Court decisively rejected this rationale in *City of Milwaukee v. National Gypsum, supra,* holding that "neither a good faith dispute over liability nor the existence of mutual fault justifies the denial of pre-judgment interest." 115 S.Ct. at 2097.

13

The Court explained that the plaintiff's award had already been reduced because of its contributory negligence. Accordingly, "[to] deny[ ] pre-judgment interest on the basis of mutual fault would seem to penalize a party twice for the same mistake." *Id.* (internal citations and quotations omitted).

In passing, however, the Supreme Court endorsed in part the district court's second reason for denying prejudgment interests, *i.e.* the extraordinary delay in reaching trial. *See City of Milwaukee,* --- U.S. at ----, 115 S.Ct. at 2096 (plaintiff's delay in prosecuting a suit is an obvious "peculiar circumstance".) The various parties filed their lawsuits in December 1987. The cases were consolidated and initially set for trial on January 8, 1990. This trial was cancelled because an attorney was ill. The trial was rescheduled for August 13, 1990, but was recessed after one day because of the FBI's criminal investigation of the presiding judge. The trial was then set for May 13, 1991. However, on May 6, 1991, the district court granted 5801's and OTC's motion for summary judgment against Continental. The case was stayed for almost two years while Continental appealed. In February 1993, the Fifth Circuit affirmed the judgment, and, in May 1993, the barge interests settled their insurance dispute. Meanwhile, the case had been reassigned to Judge Heebe. Trial finally began in September 1993, and judgment was entered in August 1994—71/2 years after the tug interests had filed suit.

While it is true that trial delays do not generally constitute a peculiar circumstance, *Socony Mobil Oil Co., Inc. v.*

14

*Texas Coastal and Int'l., Inc.,* 559 F.2d 1008, 1014 (5th Cir.1977), the series of delays that bedeviled this case was an exception to the rule. In *In re P & E Boat Rentals, Inc.,* 872 F.2d 642, 655 (5th Cir.1989), the Fifth Circuit affirmed the denial of pre-judgment interest in a case in which two trial dates had been upset because the district court was hearing the 20 week criminal trial of the Governor of Louisiana. The district court found the resulting delay, which was attributable to neither party, to be a peculiar circumstance that, together with other circumstances, justified denying pre-judgment interest.

In the instant case, trial was delayed for two years because of the insurance dispute among the barge interests; neither of the tug interests was a party to that suit. Trial was delayed an additional nine months because of the criminal investigation of the presiding judge. Overall, three trial dates were upset, and trial did not occur until 31/2 years after the first trial date. The district court did not clearly err in finding that these delays constituted a peculiar circumstance.

We conclude that the district court did not abuse its discretion in denying prejudgment interest.

C. Other Issues

The district court authored a long, meticulous opinion embodying his findings and conclusions. From their opposing perspectives, the parties have challenged numerous legal and factual aspects of his analysis. The issues they raise were summarized at the outset of this opinion, and we have considered

each of them in light of oral argument, the briefs, and the record. Having done so, it is clear that this case was hard-fought among skilled and experienced counsel before an attentive judge. We are not persuaded that the court clearly erred in his fact findings, committed reversible errors of law or reversibly abused his discretion.

## CONCLUSION

For these reasons, the judgment of the trial court is AFFIRMED.