UNITED STATES ex rel., CHERRY HILL CONVALESCENT CENTER, INC., A New Jersey Corporation, Plaintiff,

v.

HEALTHCARE REHAB SYSTEMS, INC., A Pennsylvania Corporation, et al., Defendant.

No. CIV. 94–664(JBS).

United States District Court, D. New Jersey.

Nov. 10, 1997.

Edward Borden, Jr., Susan Rabii, Saul, Ewing, Remick & Saul, Philadelphia, PA.

Roger Goldman, Jon Praed, Robert Magnanini, Latham & Watkins, Washington, DC.

## OPINION

KUGLER, United States Magistrate Judge.

This matter comes before the court on the motion by Healthcare Rehab Systems, Inc. ("HRS"), Doug Kosmin and James Luchansky (collectively, the "Defendants") to dis-

qualify counsel for *qui tam* plaintiff Relator Cherry Hill Convalescent Center, Inc. ("CHCC") and its expert consultant, the accounting firm of Heffler, Radetich & Saitta ("Heffler"). Defendants contend that the Heffler firm and plaintiff's counsel should be disqualified because Heffler has unique access to confidential information relevant to this litigation as a result of its prior relationship with HRS as its accountant. Plaintiff's counsel cross-moves for leave to withdraw as counsel.

In order to ascertain whether any confidential information was transmitted between HRS and Heffler during the period Heffler acted as HRS's accountant, and to determine the nature of HRS-related records retained by Heffler, the court held an evidentiary hearing on August 7, 1997 and August 27, 1997. At the hearing, the court heard oral argument on the motions to disqualify and testimony from George Siatta, partner in the Heffler firm. The parties introduced fifteen exhibits into the record. The court directed counsel to prepare supplemental briefs which were submitted on or before October 2, 1997. Edward F. Borden, Jr., Esquire, on behalf of the law firm of Saul, Ewing, Remick & Saul LLP, filed a cross-motion for leave to withdraw as counsel for CHCC on October 2, 1997.

Upon consideration of the parties' submissions and oral arguments, and the testimony given at the hearing, the following constitutes my findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Heffler, Radetich & Saitta[1] is a certified accounting firm located in Philadelphia, Pennsylvania. Heffler is a member of the American Institute of Certified Public Accountants (AIPCA) and the Pennsylvania Institute of Certified Public Accountants (PICPA).

2. Defendant HRS is a Pennsylvania corporation which provides rehabilitation services, including physical therapy, to persons such as residents of nursing homes. Defendant Doug Kosmin is the President of HRS. Defendant James Luchansky is the Executive Vice President of HRS.

3. In 1990, HRS retained Heffler to provide general accounting services. Heffler performed a variety of accounting services for HRS from 1990 until October 1994, including five independent annual audits of HRS's financial condition during the period August 21, 1990 through June 1994. These audits were performed in accordance with AICPA's Generally Accepted Auditing Standards (GAAS). In each audit, Heffler reached the unqualified opinion that HRS's financial statements adequately represented the financial position of the company. (Exhibit B, Certification of Robert A. Magnanini, Esquire).

4. In performing accounting work for HRS, Heffler was provided with access to HRS's business and financial records. Heffler was under a professional and legal obligation to keep confidential any information obtained about HRS in the course of its duties.

5. Mark Rovinski, former partner at Heffler and head of the Nursing Home Division, was the accountant primarily responsible for handling the accounting work performed by Heffler for HRS. During the tenure of Heffler's association with HRS, Mr. Rovinski and two assistants, Anthony Esposito and Antello Ianieri, audited HRS's records.[2] (Knauf Affidavit ¶ 7, Exhibit A to Brief in Opposition to Defendants' Motion to Disqualify).

6. George Saitta is a certified public accountant and has been a partner with the firm for fifteen (15) years. Mr. Saitta heads the healthcare area of the firm's practice, and specializes in third-party reimbursement audits on behalf of the government. Mr. Saitta performed a limited amount of business management and Medicare reimbursement consulting for HRS, but was not directly involved in the audits of HRS performed by

---

1. At the time that the accounting firm performed services for HRS, the firm was known as "Heffler & Company."

2. Defendants provide two letters which suggest that at least two other Heffler personnel, Michael Buck and Ron Bertino, may have been involved in the audits. (Exhibits L & M, Certification Robert A. Magnanini, Esquire).

Heffler. (Saitta, 8/27/97, at 3, 4, 5, 15 & 44; Knaup Affidavit ¶ 8).

7. In November 1990, CHCC became a client of Heffler through the efforts of Mr. Kosmin, who introduced Mr. Rovinski to CHCC'c management. (CH–6). At approximately the same time, CHCC became a client of HRS. HRS began providing physical therapy to patients at CHCC's facility.

8. In September 1993, counsel for HRS responded to Heffler's inquiries, made pursuant to its annual audit of HRS, regarding pending and future litigation involving HRS. HRS's counsel notified Heffler of litigation between HRS and CHCC including CHCC's intention to file a counterclaim against HRS alleging fraud in connection with HRS's billing methods. (D–4; Exhibit C, Certification of Robert A. Magnanini, Esquire).

9. On February 3, 1994, CHCC, a nursing home, brought this action as a *qui tam* plaintiff on behalf of the United States Government for violations of the False Claims Act, 31 U.S.C. § 3730(b) *et seq.* In its complaint, CHCC alleges that the defendants defrauded the United States Government during the period from November 1990 to May 1993 by overcharging CHCC and other clients for physical therapy services and then causing fraudulent bills to be submitted to the Medicare program. (Second Amended Complaint ¶ 39).

10. In October 1994, Mr. Rovinski, Mr. Esposito and Mr. Ianieri left Heffler to work for the accounting firm of M.D. Oppenheim & Company. (Knaup Affidavit ¶ 9).

11. On October 31, 1994, Craig Knaup was hired by Heffler as Manager, Long–Term Care Division, and was placed in charge of CHCC's account. Mr. Knaup's responsibilities with regard to CHCC included preparing cost reports and appeals from cost reports and providing reimbursement consulting. (Knaup Affidavit ¶ 2).

12. On November 30, 1994, Mr. Saitta and Mr. Knaup attended a dinner meeting with Mr. Kosmin to discuss the possibility of retaining HRS as a client of Heffler despite the departure of Mr. Rovinski from the firm. (Saitta, 8/27/97, at 28–30).

13. On January 17, 1995, Mr. Kosmin advised Mr. Saitta by letter that HRS had retained M.D. Oppenheim and Company to provide accounting services and that HRS authorized M.D. Oppenheim and Company to review all workpapers and documents in the possession of Heffler related to HRS. (CH–3). Heffler did not perform any accounting services for HRS between October 1994 when Mr. Rovinski left the firm and January 1995 when HRS formally terminated its professional relationship with Heffler. (Knaup Affidavit ¶ 11). Mr. Rovinski presently continues to provide HRS with accounting services.

14. After HRS terminated its relationship with Heffler, Heffler remained in the possession of documents related to HRS. Approximately two boxes of these records are presently in the possession of Heffler. At no time during HRS's association with Heffler, and at no time subsequent to the termination of this relationship, was there an ethics screen established to shield any information or documents relating to HRS from Heffler employees.

15. At least one Heffler employee has performed an inventory of the HRS-related documents which remain in the possession of Heffler. (CH–1; Saitta, 8/27/97, at 23–24). At least one Heffler employee has examined the HRS-related documents to determine if any materials therein indicate that Mr. Saitta had any involvement with the HRS file. (Saitta, 8/27/97, at 26).

16. Mr. Saitta was notified about the instant lawsuit involving CHCC and HRS in either 1995 or 1996.[3] Mr. Saitta was made aware of CHCC's allegations of fraud against HRS in a conversation with R. Steven Scherfel, President of CHCC. During that conversation, Mr. Scherfel agreed that Heffler would provide assistance to CHCC in the lawsuit as

**3.** The record indicates a discrepancy as to the actual date Heffler began to provide consulting services to CHCC in connection with this lawsuit. Mr. Saitta testified that the conversation with Mr. Scherfel occurred approximately 12 months before the hearing held August 27, 1997. (Saitta, 8/27/97, at 5). Mr Knaup, however, attests that he has performed reimbursement consulting to CHCC in connection with this lawsuit since April or May of 1995. (Knaup Affidavit ¶ 3).

part of its ongoing accountant-client relationship with CHCC. As a result of this agreement, Mr. Siatta arranged for Mr. Knaup to handle the day-to-day obligations associated with assisting CHCC. (Saitta, 8/27/97, at 5–8).

17. Mr. Knaup has performed reimbursement consulting for CHCC in connection with this lawsuit. (Knaup Affidavit ¶ 3). At no time has Mr. Knaup examined the HRS-related documents retained by Heffler, or received confidential information relating to the accounting work performed by Heffler for HRS. (Knaup Affidavit ¶ 12 & 14).

18. On March 21, 1996, the law firm of Saul, Ewing, Remick & Saul entered an appearance on the record as counsel for CHCC in this matter. Edward F. Borden, Jr. assumed the role of principal counsel for CHCC.

19. In connection to his work for CHCC in this matter, Mr. Knaup attended a document review at the offices of HRS with CHCC's counsel on October 30 & 31, 1996.

20. In a letter from Stuart S. Kurlander, Esquire, attorney for HRS, to Mr. Borden dated November 25, 1996, defendants formally objected to CHCC's use of Mr. Knaup as an expert in this litigation on the grounds that Heffler's prior engagement as HRS's accountant created a conflict of interest.[4] (Exhibit I, Certification of Robert A. Magnanini, Esquire).

21. In a letter dated April 16, 1997, Mr. Borden notified the court that Heffler was serving as an expert consultant to CHCC and to him in this matter. Mr. Borden also invoked the attorney-client communication privilege and the attorney work product doctrine with respect to certain Heffler materials requested by defendants relating to CHCC. (Exhibit E, Certification of Robert A. Magnanini, Esquire).

22. In a letter to Mr. Saitta dated April 23, 1997, Mr. Kosmin objected to CHCC's use of Heffler as a consultant. Mr. Kosmin expressed his concern that Heffler had unique access to HRS's confidential records which could prove material to this litigation. (Exhibit A, Certification of Robert A. Magnanini, Esquire).

23. On April 24, 1997, Mr. Saitta responded to Mr. Kosmin's objection. Mr. Saitta asserted that Heffler had not been retained by Mr. Borden as a consultant, but that Heffler, in the course of servicing its client, was acting on behalf of CHCC. Further, Mr. Saitta affirmed that HRS's workpapers remain confidential. (Exhibit F, Certification of Robert A. Magnanini, Esquire).

24. In a letter dated May 16, 1997, Roger S. Goldman, Esquire, of the law firm Latham & Watkins, attorney for defendants, notified Mr. Borden that defendants were planning to move to disqualify Heffler and the firm of Saul, Ewing, Remick and Saul from participating in this litigation.

25. There is no evidence that anyone at Heffler has passed confidential information about HRS to CHCC.

## II. MOTION TO DISQUALIFY EXPERT

The defendants move to disqualify the Heffler accounting firm from acting as a consulting expert on behalf of CHCC in this litigation. The defendants argue that the accounting firm is privy to confidential information relevant to this litigation because of the existence of an accountant-client relationship between Heffler and HRS during the time period CHCC alleges HRS was defrauding the government.

### A. DISCUSSION

■ A federal court has the inherit power to disqualify experts. *Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996) (citing *Campbell Ind. v. M/V GEMINI*, 619 F.2d 24, 27 (9th Cir.1980)). This power derives from the court's duty to preserve confidence in the fairness and integrity of judicial proceedings, *Paul v. Rawlings Sporting Goods*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988); *In re Ambassador Group, Inc., Litig.*, 879 F.Supp. 237, 241 (E.D.N.Y.1994), and to protect privileges which may be breached if

---

4. Defendants maintain that the use of the word "reiterate" in this letter suggests that the defendants had previously objected to the use of Mr. Knaup as an expert. No other evidence has been introduced into the record to support this assertion.

an expert is permitted to switch sides in pending litigation. *Paul,* 123 F.R.D. at 277–78.

■ Although motions to disqualify attorneys because of a conflict of interest are addressed with frequency by the courts, decisions addressing motions to disqualify experts are less common. *In re Ambassador Group,* 879 F.Supp. at 241–42. Numerous courts which have addressed the issue of expert disqualification, including this court, have declined to apply the attorney conflict standard to experts. *Cordy v. Sherwin–Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994); *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F.Supp. 1498, 1501 (D.Colo.1993); *Paul,* 123 F.R.D. at 281; *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F.Supp. 334, 338–39 (N.D.Ill.1990), *but see Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D.Minn.1986)(applying the rules governing attorney disqualification to experts); *Conforti & Eisele, Inc. v. Div. of Bldg. & Constr.,* 170 N.J.Super. 64, 405 A.2d 487 (1979)(finding that there is no sound basis for the application of different rule to experts than to attorneys). Application of the same standard in both cases is not appropriate because experts and attorneys assume different roles in litigation. *Cordy,* 156 F.R.D. at 580. Experts act as sources of information and opinions in order to assist parties and triers of facts to understand evidence. *Great Lakes,* 734 F.Supp. at 338. Attorneys act as advocates of their client's positions and, thus, owe a higher level of fiduciary duty to the client than do experts. *Id.; Paul,* 123 F.R.D. at 281.

■ In *Cordy v. Sherwin–Williams Co.,* this Court applied a two-prong test to determine whether an expert who had a prior relationship with a party should be disqualified. 156 F.R.D. at 579. *See also Paul,* 123 F.R.D. at 279 (citing *Mayer v. Dell,* 139 F.R.D. 1, 3 (1991)). "First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert." *Cordy,* 156 F.R.D. at 579. An expert should be disqualified if both inquiries are answered in the affirmative. Disqualifica-

tion, however, is inappropriate if either question is answered in the negative. *Koch Refining Co.,* 85 F.3d at 1181. Therefore, even if the party who first retained the expert reasonably assumed the existence of a confidential relationship, disqualification is not warranted where no privileged or confidential information was passed. *Wang Labs., Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991).

■ The party seeking disqualification bears the burden of establishing both the existence of confidentiality and its nonwaiver. *Cordy,* 156 F.R.D. at 580. Here, defendants HRS, Doug Kosmin and James Luchansky seek to disqualify the Heffler accounting firm. Therefore, the defendants bear the burden of proof on these issues.

## B. DISQUALIFICATION

### 1. *Confidential Relationship*

Applying the first prong of the disqualification test, the proper focus for the court is whether HRS acted reasonably in assuming that a confidential or fiduciary relationship existed between HRS and Heffler, and that any confidential communications between them regarding this litigation would be maintained in confidence.

Neither party disputes that Heffler is under a legal and professional obligation to preserve the confidentiality of any information it obtains from its clients. Heffler, as a certified public accounting firm licensed to practice in the State of Pennsylvania, is legally bound by Pennsylvania statute to maintain client confidences. This statute provides: "Except by permission of the client engaging him … a licensee … shall not be required to, and shall not voluntarily, disclose or divulge information of which he may have become possessed relative to and in connection with any professional services as a certified public accountant, public accountant, partnership or corporation …. [t]he information shall be deemed confidential and privileged." 63 Penn. Statutes § 9.11a. Thus, **any** information, including any communications pertinent to a pending litigation, obtained from a client in relation to accounting services performed for that client is pre-

sumed confidential and privileged. Such information, however, may be disclosed if "required to be disclosed by the standards of . the profession in reporting on the examination of financial statements, or in making disclosure in a court of law ...." or in other statutorily enumerated circumstances. *Id.*

In addition, the AICPA's Code of Professional Conduct, which has been adopted by the Pennsylvania Institute of CPAs, requires that "a member in public practice shall not disclose any confidential information without the consent of the client." Rule 301.

It is also undisputed that Heffler served as HRS's accountant during the entire period during which CHCC alleges HRS was defrauding the government. As part of its standard auditing practice, Heffler asked HRS to identify any pending or future litigation in which it was or anticipated being involved. At the time that HRS notified Heffler of CHCC's claims against it, the two parties had established a working accountant-client relationship.

Although at no time did HRS formally seek to retain Heffler as a consultant or otherwise request assistance from Heffler regarding this litigation, the court finds that a professional relationship was established between HRS and Heffler such that it was objectively reasonable for HRS to assume that any confidential communications relating to its litigation with CHCC would be maintained in confidence.

The existence of a confidential relationship does not end the inquiry. In order to warrant disqualification, confidential information about HRS related to this litigation must actually have been transmitted to Heffler. *See In re Ambassador Group,* 879 F.Supp. 237.

2. *Disclosure of Confidential Information*

In considering the second prong of the analysis, the court finds that HRS did not disclose confidential information relating to this specific litigation to Heffler.

■ Confidential information, in the context of expert disqualification, includes: " 'discussion of the [retaining party's] strategies in the litigation, the kinds of expert [the

party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses.' " *Koch Refining Co.,* 85 F.3d at 1182 (quoting *Mayer,* 139 F.R.D. at 4). In *Palmer v. Ozbek,* an expert hired by one party which had received discoverable information from the opposing party was not disqualified. 144 F.R.D. 66 (D.Md.1992). In *Cordy,* this court concluded that a binder of materials, composed mostly of discoverable documents, nevertheless constituted confidential information relating to the litigation because at least some of the documents were not subject to disclosure and the selection process used to assemble the binder rendered it protected work product. 156 F.R.D. at 581–82. On the other hand, one court has found that information acquired by an accounting firm about the moving party's modus operandi through a prior relationship was not confidential information. *In re Ambassador Group,* 879 F.Supp. at 244.

The defendants argue that the Heffler firm should be disqualified from acting as consulting experts to CHCC because HRS disclosed confidential information to Heffler which is relevant to the matters at issue in this litigation. Defendants rely on the *Marvin Lumber* case in support of their position. In *Marvin Lumber & Cedar Co. v. Norton Co.,* the court disqualified an expert witness that had provided professional services to the opposing party related to the matters at issue in the litigation. 113 F.R.D. 588. The court, applying the principles for attorney disqualification, found that the matters involved in the lawsuit were "substantially related" to matters to which the expert had been exposed to in rendering services to the first party. *Id.* at 592. The *Marvin Lumber* court, however, did not address whether confidential communications regarding the litigation at issue passed between the expert and the party seeking disqualification.

■ Because the court declines to apply the attorney disqualification rules to experts, it finds the reasoning of *Marvin Lumber* unpersuasive. Defendants argue that Heffler should be disqualified because its personnel were privy to information relevant to this

litigation, but not confidential information directly about or regarding the instant matter. The court finds it necessary to make a distinction between confidential business and financial records and confidential communications related to a particular litigation. The court accepts the argument that Heffler must have been privy to business and financial information of HRS, such as billing and reimbursement data, which it had a legal and professional duty to keep confidential and which may be relevant to this litigation. Neither party disputes that this type of information, when relevant, is discoverable.

Confidential business information, however, may be distinguished from confidential communications or documents pertaining to litigation. The defendants have not submitted any evidence to the court to suggest that such confidences were ever exchanged between HRS and Heffler. Instead, the defendants ask the court to make the inference that such information passed from HRS to Heffler. In fact, only one document has been produced which demonstrates that Heffler had notice that CHCC was seeking leave of court to file a claim against HRS alleging fraud. Nothing in this letter or in any other evidence submitted to the court indicates that any communications which can readily fall within the work product doctrine or within the scope of the attorney-client privilege were exchanged. The court notes that the federal courts do not recognize a confidential accountant-client privilege. *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Furthermore, there is no evidence indicating that HRS ever requested that Heffler act as its litigation consultant or, for that matter, that any Heffler employee ever had communications with HRS regarding this particular lawsuit.

The defendants also contend that, because Heffler was notified of CHCC's allegations of fraud against HRS, Heffler was obligated by AICPA guidelines to take steps beyond those normally necessary in a standard audit to investigate whether revenue had been obtained from illegal acts. Defendants argue that as a result of Heffler's obligation to probe into these charges, Heffler probably obtained relevant facts which can readily be used against HRS in this litigation. The AICPA Statement on Auditing Standards No. 54 sets forth audit procedures to be used when an auditor is alerted to possible illegal acts. SAS 54.10. In such a situation, an auditor "should inquire of management at a level above those involved, if possible." *Id.* If management does not provide a satisfactory answer, then the guidelines suggest that the auditor consult with the client's legal counsel or other specialists, or apply additional procedures, such as examining supporting documents and confirming significant information. *Id.*

Despite citing these guidelines, the defendants have not submitted any evidence to suggest that Heffler personnel ever took these additional steps to investigate CHCC's fraud allegations. There are no records which indicate that Heffler auditors contacted high-level management at HRS or HRS counsel to discuss the fraud allegations, or applied any additional procedures to investigate these charges.

Despite a relationship conducive to confidential disclosures, I conclude that HRS did not impart significant confidential disclosures pertaining to the litigation between HRS and CHCC to Heffler. *See English Feedlot*, 833 F.Supp. at 1503. Since I find that no confidential communications were transmitted between HRS and Heffler regarding this litigation, I need not address the issue of waiver.

3. *Prejudice*

■ In addition to the two-prong test, the court should balance competing policy objectives in determining whether an expert should be disqualified. *Cordy*, 156 F.R.D. at 580. The policy objectives that favor disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity. *Id.* The policy objectives that weigh against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions. *Id.* In balancing these concerns, courts have considered whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert. *E.g., Koch Refining Co.*, 85 F.3d at 1183;

*Wyatt v. Hanan,* 871 F.Supp. 415, 422 (M.D.Ala.1994); *Cordy,* 156 F.R.D. at 582.

The defendants assert that fundamental fairness mandates Heffler's disqualification in order to avoid an appearance of impropriety. The defendants argue that the plaintiff should not be able to benefit from Heffler's unique access to HRS's finances and business practices. The plaintiff counters that Heffler's disqualification at this stage of the litigation will unduly prejudice CHCC because Mr. Knaup has specialized knowledge valuable to CHCC.

■ Balancing the competing policy objectives, I find that justice is best served by allowing the accounting firm of Heffler to continue serving as a consulting expert to CHCC. Mr. Knaup, the accountant at Heffler placed in charge of CHCC's account, specializes in cost report analysis and reimbursement issues and has a long-standing relationship with CHCC. Since no confidential or privileged communications pertinent to this litigation were disclosed by HRS to the Heffler firm, and more specifically, to Mr. Knaup himself, HRS will not be prejudiced by Heffler's continued participation in this litigation. Courts are generally reluctant to disqualify experts, "especially those ... who possess useful specialized knowledge." *English Feedlot,* 833 F.Supp. at 1505.

Accordingly, defendants' motion to disqualify the firm of Heffler, Radetich & Saitta from serving as a consulting expert for Plaintiff Relator Cherry Hill Convalescent Center shall be denied.

## III. MOTION TO WITHDRAW

Since my decision will moot defendants' motion to disqualify counsel, I will consider Saul, Ewing, Remick & Saul's motion to withdraw as counsel on behalf of Plaintiff Relator Cherry Hill Convalescent Center next. In support of this motion, counsel has submitted the *ex parte* Certification of Edward Borden, Jr., Esquire.

### A. LEGAL STANDARD

Rule 102.1 of the Local Civil Rules of the United States District Court for the District of New Jersey ("Local Rules") provides that, unless other counsel is substituted for a party, no attorney may withdraw an appearance except by leave of court. There has not been substituted counsel for CHCC, so counsel must obtain leave of court to withdraw.

The American Bar Association's Rules of Professional Conduct ("RPC"), as revised by the New Jersey Supreme Court, provide the standard for withdrawal of counsel in this case. Local Rule 103.1(a). RPC 1.16, "Declining or Terminating Representation," defines the circumstances warranting either mandatory [5] or permissive [6] withdrawal of counsel.

■ When evaluating a petition to withdraw, the court has established certain criteria for consideration: 1) the reason withdrawal is sought; 2) the prejudice

---

**5.** RPC 1.16(a) provides, in pertinent part:

(a) *Except as stated in paragraph (c) [when the Court orders representation],* a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1) the representation will result in violation of the Rules of Professional Conduct or other law;

(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client; or

(3) the lawyer is discharged.

**6.** The permissive portion of RPC 1.16 reads as follows:

(b) *Except as stated in paragraph (c),* a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

(1) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

(2) the client has used the lawyer's services to perpetrate a crime or fraud;

(3) a client insists upon pursuing an objective that the lawyer considers repugnant or imprudent;

(4) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

(5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or

(6) other good cause for withdrawal exists.

withdrawal may cause to other litigants; 3) the harm withdrawal may cause to the administration of justice; and 4) the degree to which withdrawal may delay the resolution of the case. *In re Avant–Garde Computing, Inc. Sec. Litig.,* 1989 WL 103625 (D.N.J. Sept. 5 1989); *Haines v. Liggett Group,* 814 F.Supp. 414, 423 (D.N.J.1993).

### B. DISCUSSION

■ The court has evaluated Saul, Ewing, Remick & Saul's motion to withdraw and has determined that counsel has demonstrated "good cause" for permissive withdrawal pursuant to RPC 1.16(b)(6). Both attorney and client concede that they have become mired in an ongoing fee dispute which has affected their working relationship. The court does not see any benefit in directing attorney and client to proceed in this litigation with an adversarial relationship.

■ In addition, the court finds that granting counsel's motion will not prejudice any party involved in the litigation. In fact, all defendants have moved to disqualify plaintiff's counsel. Furthermore, in a letter to the court dated October 24, 1997, R. Steven Sherfel, President of CHCC, states that he does not oppose this motion. The court also concludes that granting the motion to withdraw will not delay the resolution of the case. To date, the court has not entered the Joint Final Pretrial Order or scheduled this matter for trial.

Accordingly, the motion by Edward Borden, Esquire, on behalf of the law firm of Saul, Ewing, Remick & Saul, to withdraw as counsel for Plaintiff Relator Cherry Hill is granted. Plaintiff is advised that pursuant to 28 U.S.C. § 1654 and *Simbraw, Inc. v. United States of America,* 367 F.2d 373 (3d Cir. 1966), a corporation may not proceed *pro se* or by a representative or agent of the corporation. Failure to obtain licensed counsel may result in dismissal of the plaintiff's complaint.

The court will provide Plaintiff Relator CHCC with thirty (30) days to retain new counsel and enter counsel's appearance. A status conference will be convened by this court at which the parties will be requested to inform the court of any additional discovery they feel they need.

### IV. CONCLUSION

For the reasons expressed, defendants' motion to disqualify Plaintiff Relator CHCC from using Heffler, Radetich & Saitta as a consulting expert in this litigation is DENIED. Mr. Borden's motion, on behalf of the firm of Saul, Ewing, Remick & Saul, for leave to withdraw as counsel is GRANTED. Defendants' motion to disqualify plaintiff's counsel is DISMISSED AS MOOT.

The accompanying Order shall enter today.