**In re Coy Lee MCCARTER, Susan Rymer McCarter, Debtors.**

No. 02–31000.

United States Bankruptcy Court, E.D. Tennessee.

July 22, 2003.

Craig J. Donaldson, Kite, Bowen & Associates, P.A., Sevierville, TN, for Debtors.

Wilson S. Ritchie, Ella M. Sims, The Ritchie Law Firm, P.C., Knoxville, TN, for Branch Banking and Trust Company.

Richard F. Clippard, United States Trustee, Patricia C. Foster, Knoxville, TN, for United States Trustee.

### MEMORANDUM ON DEBTORS' MOTION TO DISQUALIFY EXPERT WITNESS

RICHARD S. STAIR, Jr., Bankruptcy Judge.

This contested matter is before the court on the Motion of the Debtors to Continue Final Hearing on the Motion for Relief from Automatic Stay and/or Adequate Protection Filed by Branch Banking & Trust Company, to Disqualify the Expert Witness for Branch Banking & Trust Company, and for Other Relief (Motion to Disqualify) filed by the Debtors in this

Chapter 11 bankruptcy case on December 6, 2002. The Motion to Disqualify, *inter alia*, requests that the court disqualify Kenneth R. Woodford, appraiser, from testifying as an expert witness for Branch Banking and Trust Company (BB & T) at the final hearing on its Motion for Relief from Automatic Stays and/or Adequate Protection (Motion for Relief) filed on October 4, 2002.[1]

Facts and documents essential to the resolution of the disqualification issue are before the court on the Joint Stipulations of Fact filed by the parties on July 2, 2003.[2] Additionally, BB & T filed a Memorandum in Support of BB & T's Response to the Debtors' Motion to Disqualify BB & T's Expert Witness on July 2, 2003, and the Debtors filed a Memorandum of the Debtors in Support of Their Motion to Disqualify the Expert Witness for Branch Banking & Trust Company on July 3, 2003.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A), (O) (West 1993).

## I

The Debtors filed the Voluntary Petition commencing their bankruptcy case under Chapter 11 on February 26, 2002. BB & T is a secured creditor by virtue of an original Promissory Note dated September 13, 1996, in the principal amount of $1,200,000.00, executed by the Debtors in favor of BankFirst[3] and secured by real property located in Sevier County, Tennessee (the Real Property), comprised of eight lots in the Echota Resort and a seventy-five acre tract of undeveloped land, as evidenced by a Tennessee Deed of Trust dated September 13, 1996.[4] The September 13, 1996 Deed of Trust was supplemented by a Modification to Deed of Trust dated August 15, 1997, whereby an additional 5.88 acres of real property in Sevier County, Tennessee, was pledged as collateral pursuant to the original $1,200,000.00 promissory note, and thus securing the loan by a total of approximately 81.10 acres. Subsequently, the Debtors executed a Promissory Note dated December 14, 1998, in the principal amount of $815,912.44, along with a Modification of Deed of Trust dated December 13, 1998.[5] Finally, the Debtors executed a Renewal Promissory Note dated October 1, 1999, in the principal amount of $815,912.44, along with a Modification of Deed of Trust dated

---

1. Although the Motion to Disqualify addresses other matters, it is only the disqualification issue that will be considered by the court in this Memorandum.

2. The Joint Stipulations of Fact and BB & T's brief were dual-captioned with a related Chapter 11 case, *In re Echota Development, L.P.*, Case No. 02–30998; however, the Motion to Disqualify was filed only in the McCarters' bankruptcy case. Accordingly, the documents erroneously filed in the Echota Development, L.P. bankruptcy case, including the Adoption of Joint Stipulations of Fact and Memorandum of Coy Lee McCarter and Susan Rymer McCarter filed by Echota Development, L.P. on July 7, 2003, are not properly before the court and have not been considered.

3. BB & T is the successor-in-interest to BankFirst.

4. The original promissory note was renewed by the following: (1) a Promissory Note dated September 13, 1997, in the principal amount of $765,912.44; (2) a Promissory Note dated December 15, 1997, in the principal amount of $765,912.44; (3) a Promissory Note dated June 15, 1998, in the principal amount of $765,912.44; and (4) a Promissory Note dated September 13, 1998, in the principal amount of $765,912.44, all secured by the September 13, 1996 Deed of Trust.

5. This promissory note was renewed by a Promissory Note dated June 29, 1999, in the principal amount of $815,912.44, also secured by the December 13, 1998 Modification of Deed of Trust.

October 1, 1999.[6] BB & T is also a creditor of Mr. McCarter, individually, by virtue of a Promissory Note executed by Coy Lee McCarter dated December 8, 2000, in the principal amount of $40,000.00. BB & T filed a secured Proof of Claim in the Debtors' bankruptcy case in the amount of $669,779.07.

Kenneth R. Woodford is an appraiser, certified by the State of Tennessee, and a member of the American Society of Appraisers and the Knoxville Board of Realtors. On or around September 24, 1996, Mr. Woodford and his firm, Woodford & Associates Appraisal Company, were hired by BB & T to review an appraisal prepared by Smoky Mountain Real Estate Appraisers on the Real Property pledged as security to BB & T by the Debtors pursuant to the September 13, 1996 Deed of Trust. This original appraisal listed an aggregate fair market value for thirty-eight lots, including the eight pledged to BB & T, of $1,235,000.00 or $32,000.00 per lot in gross. The appraisal also assigned a fair market value of $1,575,000.00, or $21,000.00 per acre, for the seventy-five undeveloped acres.

Mr. Woodford appraised the Real Property on or around September 18, 2001, for Montechota Centre, LLC and Commercial Mortgage Fund USA, and filed a written appraisal on September 24, 2001, assigning fair market values to the Real Property as follows: (1) forty-five cabin sites, including the eight lots pledged to BB & T, at $40,000.00 retail per lot value, with an average per lot value of $27,000.00, if the lots were sold in bulk; and (2) two hundred acres, including the undeveloped seventy-five acres pledged to BB & T, at $13,000,000.00 or $65,000.00 average per acre. Mr. Woodford again appraised the Real Property for BB & T on or around June 21, 2002,[7] this time assigning fair market values of $170,000.00 for the eight cabin lots and $2,250,000.00 for the undeveloped acreage.

On September 23, 2002, the Debtors filed an Application of Debtor to Employ Appraiser, seeking the court's permission pursuant to 11 U.S.C.A. § 327 (West 1993) to hire Mr. Woodford as the estate's expert appraiser. In support of the application to employ, Mr. Woodford executed a Verified Statement on October 29, 2002, in which he stated that neither he nor Woodford & Associates had any "connection with the debtor, creditors, or any other parties in interest or their respective attorneys, except that we have previously performed an appraisal of debtors' real property in Sevier County, Tennessee." The court entered an Order Approving Employment of Appraiser by Debtors–in–Possession entered on November 22, 2002, *nunc pro tunc* to September 1, 2002, approving the general employment of Mr. Woodford for the Debtors' bankruptcy estate.[8]

Pursuant to its rights under the promissory notes and deeds of trust, on October 4, 2002, BB & T filed its Motion for Relief

6. This promissory note was renewed by the following: (1) a Promissory Note dated January 3, 2000, in the principal amount of $815,912.44; (2) a Promissory Note dated March 27, 2000, in the principal amount of $815,912.44; and (3) a Promissory Note dated December 8, 2000, in the amount of $690,912.44, all secured by the October 1, 1999 Modification of Deed of Trust.

7. The Joint Stipulations of Fact filed by the parties state that Mr. Woodford was hired on or about June 24, 2002; however, his appraisal report in connection with this employment was dated June 21, 2002.

8. Applications to employ Mr. Woodford were also filed and approved in the related bankruptcy cases of *In re Echota Development, L.P.*, Case No. 02–30998, and *In re Great Smokies Mgmt. Corp.*, Case No. 02–30999.

in the Debtors' bankruptcy case. The Debtors filed a Response of the Debtors to Motion for Relief from Automatic Stay of Branch Banking & Trust on October 30, 2002, and, relying upon Mr. Woodford's September 24, 2001 appraisal values, argued that there was equity in the Real Property and that they could not successfully reorganize without use of the Real Property.[9] BB & T filed the Memorandum in Support of BB & T's Motion for Relief from Automatic Stay and/or Adequate Protection on December 4, 2002, relying on the values from Mr. Woodford's June 2002 appraisal rather than the September 2001 appraisal values. Thereafter, on December 6, 2002, the Debtors filed their Motion to Disqualify, urging the court to disqualify Mr. Woodford from testifying as BB & T's expert witness because Mr. Woodford has since been employed by the Debtors as appraiser for the bankruptcy estate, creating a conflict of interest. BB & T opposes the Motion to Disqualify, arguing that there is no conflict of interest, or alternatively, that the Debtors consented to BB & T's use of Mr. Woodford because they did not object immediately upon BB & T's filing of its Motion for Relief.

## II

■ The Debtors seek Mr. Woodford's disqualification as an expert witness in connection with BB & T's Motion for Relief, stating that because Mr. Woodford has been retained by the Debtors, his testifying on behalf of BB & T at the hearing on their Motion for Relief constitutes a conflict of interest. The Debtors, as the party seeking to disqualify Mr. Woodford, bear the burden of proof. *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir.1996).

As a primary matter, both parties argue that this issue is governed by 11 U.S.C.A. § 327, concerning employment of professional persons. Even though Mr. Woodford was employed as the Debtors' appraiser pursuant to the requirements of § 327, the issues of whether Mr. Woodford was a "disinterested person" under 11 U.S.C.A. § 327(a) and 11 U.S.C.A. § 101(14) (West 1993), capable of being employed by the Debtors, or whether Mr. Woodford should have been disqualified for employment by the Debtors pursuant to 11 U.S.C.A. § 327(c) are not properly before the court. Instead, the only matter presently before the court is whether Mr. Woodford should be allowed to testify as an expert witness for BB & T, an adversary of the Debtors, at the same time that he is also employed by the Debtors.

■ Courts have broad discretion to admit expert witnesses and to weigh their testimony. *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001). Likewise, it is within a judge's discretion to disqualify an expert witness when disqualification will serve "the purpose of protecting various privileges which may be breached in some fashion if an expert is permitted to change sides during litigation, or as part of the court's inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings." *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988). Courts are reluctant to disqualify a party's expert witnesses absent a finding that an actual conflict of interest exists; however, all doubts are generally resolved in favor of disqualification. *W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61, 64–65 (D.Md.1993).

---

**9.** In the Response to BB & T's Motion for Relief, the Debtors stated that the eight lots had a value of $320,000.00 and the 81.10 acres had a value of $5,265,000.00.

Still, the standards for disqualification of an expert witness are not, and should not be, the same as required for disqualification of an attorney "because experts and attorneys assume different roles in litigation." *United States ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.,* 994 F.Supp. 244, 249 (D.N.J.1997). An attorney is an advocate for his clients, owing a high level of fiduciary duty and an undivided loyalty to his clients. *Healthcare Rehab Sys., Inc.,* 994 F.Supp. at 249; *Estate of Halas v. Comm'r,* 94 T.C. 570, 577, 1990 WL 40948 (1990). On the other hand, an expert's role is not one of advocacy, but is instead "a source of information and opinions in order to assist parties and triers of fact to understand evidence." *Healthcare Rehab Sys., Inc.,* 994 F.Supp. at 249; *United States v. Salamanca,* 244 F.Supp.2d 1023, 1025 (D.S.D.2003). Appraisers, in general, do not have a privileged relationship with their clients, nor are they advocates for their clients. *Estate of Halas,* 94 T.C. at 577. In fact, The Principles of Appraisal Practice and Code of Ethics promulgated by the American Society of Appraisers addresses this issue as follows:

> Section 2.2. Objective Character of the Results of an Appraisal Undertaking. The primary objective of a monetary appraisal, is determination of a numerical result, either as a range or most probable point magnitude—the dollar amount of a value, the dollar amount of an estimated cost, the dollar amount of an estimated earning power. This numerical result is objective and unrelated to the desires, wishes, or needs of the client who engages the appraiser to perform the work. The amount of this figure is as independent of what someone desires it to be as a physicist's measurement of the melting point of lead or an accountant's statement of the amount of net profits of a corporation. All the

principles of appraisal ethics stem from this central fact.

> Section 4.3. Appraiser's Obligation Relative to Giving Testimony.

> When an appraiser is engaged by one of the parties in a controversy, it is unethical for the appraiser to suppress any facts, data, or opinions which are adverse to the case his client is trying to establish; or to overemphasize any facts, data, or opinions which are favorable to his client's case; or in any other particulars to become an advocate. It is the appraiser's obligation to present the data, analysis, and value without bias, regardless of the effect of such unbiased presentation on his client's case.

> Section 4.6. Agreements and Contracts for Appraisal Services.

> It is good practice to have a written contract, or at least a clear oral agreement, between appraiser and client, covering objectives and scope of work, time of delivery of report, and amount of fees. In certain circumstances, it may be desirable to include in the appraisal-service contract a statement covering the objective character of appraisal findings and a statement that the appraiser cannot act as an advocate or negotiator.

> Section 7.5. Advocacy.

> If an appraiser, in the writing of a report or in giving an exposition of it before third parties or in giving testimony in a court action suppresses or minimizes any facts, data, or opinions which, if fully stated, might militate against the accomplishment of his client's objective or, if he adds any irrelevant data or unwarranted favorable opinions or places an improper emphasis on any relevant facts for the purpose of aiding his client in accomplishing his objective, he is, in the opinion of the Society, an advocate. Advocacy, as here described, af-

fects adversely the establishment and maintenance of trust and confidence in the results of professional appraisal practice and the Society declares that it is unethical and unprofessional.

THE PRINCIPLES OF APPRAISAL PRACTICE AND CODE OF ETHICS (2003); *see also* TENN. CODE ANN. § 62–39–329 (1997) ("[S]tate licensed and/or certified real estate appraisers must comply with the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Standards Board of the Appraisal Foundation and any other duly established standards of the commission."); *Estate of Halas,* 94 T.C. at 577–78 ("A confidential advocacy relationship between the appraiser and the client would negate an appraiser's effectiveness. In the context of valuation cases, . . . experts may lose their usefulness and credibility when they merely become advocates for one side.").

 In a case such as this, where the expert witness has effectively "switched sides" between two adversaries, the court's determination as to whether he should be disqualified focuses on "(1) Whether it is objectively reasonable for the party seeking disqualification to believe a confidential relationship existed between that party and the expert, and if so (2) Whether the party seeking disqualification disclosed confidential information to the expert." *Commerce Indus. Ins. Co. v. E.I. du Pont de Nemours & Co. (In re Malden Mills Indus., Inc.),* 275 B.R. 670, 673 (Bankr. D.Mass.2002); *Paul,* 123 F.R.D. at 278 The court may also look to "whether disqualification is necessary to preserve the integrity of the judicial system" even if no disclosure of confidential information occurred. *Malden Mills Indus., Inc.,* 275 B.R. at 673–74.

Although an appraiser is prohibited from being an advocate of his client, The Principles of Appraisal Practice and Code of Ethics do impose upon its members a duty of confidentiality:

4.1 Confidential Character of an Appraisal Engagement.

The fact that an appraiser has been employed to make an appraisal is a confidential matter. In some instances, the very fact of employment may be information that a client, whether private or a public agency, prefers for valid reasons to keep confidential. Knowledge by outsiders of the fact of employment of an appraiser may jeopardize a client's proposed enterprise or transaction. Consequently, it is improper for the appraiser to disclose the fact of his engagement, unless the client approves of the disclosure or clearly has no interest in keeping the fact of the engagement confidential, or unless the appraiser is required by due process of law to disclose the fact of his engagement.

In the absence of an express agreement to the contrary, the identifiable contents of an appraisal report are the property of the appraiser's client or employer and, ethically, cannot be submitted to any professional Society as evidence of professional qualifications, and cannot be published in any identifiable form without the client's or employer's consent.

THE PRINCIPLES OF APPRAISAL PRACTICE AND CODE OF ETHICS. Based upon this requirement of the American Society of Appraisers, it was objectively reasonable for the Debtors to believe that a confidential relationship existed between them and Mr. Woodford, as their court-approved appraiser. Likewise, it was entirely reasonable for BB & T to assume that it also shared a confidential relationship with Mr. Woodford as to the subject Real Property. Accordingly, the first prerequisite of the disqualification test is met as to either BB & T or the Debtors, in that both parties have been "clients" of Mr. Woodford in his

capacity as appraiser, and either party was reasonable in believing that it enjoyed a confidential relationship with Mr. Woodford in his role as appraiser.

█ As for the issue of whether any confidential information was actually disclosed by the Debtors or BB & T to Mr. Woodford, neither party presented any proof to address this question. The court was not presented with affidavits from either of the Debtors, any bank official for BB & T, or Mr. Woodford. Accordingly, the court cannot make a determination that any confidential information has been disclosed by either party to Mr. Woodford.

Nevertheless, the court is troubled by the integrity of allowing Mr. Woodford to be employed by the Debtors as the appraiser for the bankruptcy estate, while at the same time, allowing Mr. Woodford to testify for BB & T in a contested matter against the Debtors. In the court's opinion, this scenario presents an actual conflict of interest, which is buttressed by certain rules and regulations contained in Tennessee Code Annotated Title 62 and The Principles of Appraisal Practice and Code of Ethics, under which Mr. Woodford is bound.

First, Tennessee Code Annotated Title 62, governing real estate appraisers, provides, in material part, that

(4) "Appraisal assignment" means an engagement for which an appraiser is employed or retained to act, or would be perceived by third parties or the public as acting, as a disinterested third party in rendering an unbiased analysis, opinion or conclusion relating to the nature, quality, value or utility of specified interests in, or aspects of, identified real estate;

. . . .

(14) "Specialized services" means those appraisal services which do not fall within the definition of "appraisal assign-

ment." "Specialized services" may include valuation work and analysis work. Regardless of the intention of the client or employer, if the appraiser would be perceived by third parties or the public as acting as a disinterested third party in rendering an unbiased analysis, opinion or conclusion, the work is classified as an appraisal assignment and not specialized services[.]

TENN. CODE ANN. § 62–39–102 (1997). This language is similar to § 327(a), which governs Mr. Woodford's employment by the Debtors' bankruptcy estate:

(a) Except as otherwise provided in this section, the trustee [or debtor-in-possession pursuant to 11 U.S.C.A. § 1107 (West 1993) ], with the court's approval, may employ one or more . . . appraisers, . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C.A. § 327(a).

Perhaps even more compelling, however, is the following regulation set forth in The Principles of Appraisal Practice and Code of Ethics:

Section 4.5. Appraiser's Obligation Relative to Serving More Than One Client in the Same Matter.

When two or more potential clients seek an appraiser's services with respect to the same property or with respect to the same legal action, the appraiser may not properly serve more than one, except with the consent of all parties.

THE PRINCIPLES OF APPRAISAL PRACTICE AND CODE OF ETHICS.

BB & T has argued that because Mr. Woodford never actually appraised the Real Property at issue in the Motion for Relief for the Debtors, there is no actual

conflict of interest. Indeed, the Debtors stipulated that they arrived at the values used in their Response to BB & T's Motion for Relief by taking Mr. Woodford's September 2001 appraisal values and calculating the retail value per lot and the average price per acre, admitting that Mr. Woodford has not appraised, for the Debtors themselves, the Real Property in which BB & T holds a security interest. Regardless, the above referenced section of The Principles of Appraisal Practice and Code of Ethics expressly states that an appraiser may not serve more than one client with regards to either an appraisal of the same property or "with respect to the same legal action" unless all parties consent to the dual representation. Clearly, the Debtors have not given their consent to Mr. Woodford's services to both BB & T and the Debtors concerning the subject Real Property of BB & T's Motion for Relief.

The court finds that Mr. Woodford may not continue his employment for general purposes with the Debtors and at the same time testify for BB & T on its Motion for Relief, which is unequivocally an interest adverse to the Debtors. Accordingly, Mr. Woodford is disqualified as BB & T's expert witness regarding its Motion for Relief. The court reserves all other issues in the Debtors' Motion to Disqualify concerning Mr. Woodford's employment by the Debtors' bankruptcy estate and/or any future disqualification or compensation to such time as these issues are properly before the court.

An order consistent with this Memorandum will be entered.

### ORDER

For the reasons stated in the Memorandum on the Debtors' Motion to Disqualify Expert Witness filed this date, the court directs that to the extent the Debtors, by the Motion of the Debtors to Continue Final Hearing on the Motion for Relief from Automatic Stay and/or Adequate Protection Filed by Branch Banking & Trust Company, to Disqualify the Expert Witness for Branch Banking & Trust Company, and for Other Relief, filed December 6, 2002, request that Kenneth R. Woodford, appraiser, be disqualified from testifying as an expert witness at the hearing on Branch Banking and Trust Company's Motion for Relief from Automatic Stays and/or Adequate Protection filed on October 4, 2002, the Motion is GRANTED. Kenneth R. Woodford is disqualified.

SO ORDERED.